CAR CARRIERS, INC., et al.,
Plaintiffs-Appellants,

v.

FORD MOTOR COMPANY and Nu-Car
Carriers, Inc., Defendants-Appellees.

No. 83–1825.

United States Court of Appeals,
Seventh Circuit.

Argued April 9, 1984.

Decided Oct. 2, 1984.

As Amended Oct. 30, 1984.

Rehearing Denied Oct. 30, 1984.

1102

Francis J. McConnell, McConnell, Ruber-ry & Beckley, Chicago, Ill., for plaintiffs-appellants.

Robert M. Gault, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Boston, Mass., Michael K. Murtaugh, Baker & McKenzie, Chicago, Ill., for defendants-appellees.

Before ESCHBACH and FLAUM, Circuit Judges, and JAMESON, Senior District Judge.*

ESCHBACH, Circuit Judge.

Essentially two questions are presented by this appeal: (1) whether the district court erred in dismissing the plaintiffs' antitrust complaint for failure to state a claim upon which relief could be granted and (2) whether the district court erred in refusing to allow the plaintiffs leave to amend. For the reasons stated below, we affirm the judgment of the district court on both issues.

I

A

██ The factual allegations of the complaint, which we must assume are true in considering the propriety of a dismissal for failure to state a claim, are as follows:

Car Carriers, Inc. ("Car Carriers"), its affiliate Clark Transport Co., Inc. ("Clark"), JPB Corp. (the parent of Car Carriers and Clark), James P. Byrne (the controlling shareholder of JPB Corp.), and three other related enterprises[1] initiated this action against Ford Motor Company ("Ford") and Nu-Car Carriers, Inc. ("Nu-Car"). Count I of the six-count complaint alleged a conspiracy in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and sought recovery under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26; the remaining five counts asserted pendent state-law claims.

From 1968 until October 1981, both Car Carriers and Clark transported new Ford vehicles from Ford's plants and railheads in the Chicago area. Car Carriers, but apparently not Clark, served only Ford. Both transport companies were regulated by the Interstate, as well as the Illinois, Commerce Commissions; thus, their rates were subject to approval by these regulatory agencies. Ford had the power to "dictate[ ] and control[ ]" the rates either by formally opposing any rate increase sought before the agencies or by unilaterally terminating the carrier. Complaint ¶ 19(d)–(g).

As early as 1975, "defendants and their co-conspirators entered into contracts and engaged in a continuing combinations [sic] and conspiracies to restrain trade in the business of providing haulaway motor transportation for new Ford automobiles and to injure or destroy the businesses of plaintiffs and certain other similarly situated Ford carriers." Complaint ¶ 19. The defendants employed the following methods in implementing their common goal. First, the carrier selected for elimination (the so-called "target carrier") would be required to make substantial investments in new tractor-trailer equipment, real estate, and new terminal facilities. In return, Ford would promise additional transportation traffic and "complete agreement with *increased* tariff rates necessary to pay for these acquisitions." Complaint ¶ 19(b), (c) (emphasis added). After the "target" carriers had made these investments, however, Ford would then prevent them from obtaining the rate increases necessary for profitable operations. Complaint ¶ 19(d), (e).

Second, Ford, with support of other carriers, "[i]nterfered with and prevented [the]

---

* The Honorable William J. Jameson, Senior District Judge of the United States District Court for the District of Montana, sitting by designation.

1. The additional parties are Carrier Equipment Co. ("Carrier"), Transco Corp. ("Transco") (both subsidiaries of JPB Corp.), and Tykely Investment Co. (a limited partnership between Byrne and the members of his family).

target haulaway carriers and their affiliates from selling their businesses and assets as going business concerns or prevented [the] target haulaway carriers from consolidation or merger with other carriers." Complaint ¶ 19(h). Finally, Ford would apparently terminate its relationship with the target carrier at this point, thereby allowing the favored carriers to "acquire the businesses and assets of [the target carriers] at distress prices or for less than fair market value as going business concerns." Complaint ¶ 19(i).

The "destruction" of Car Carriers generally followed the pattern described above, as the complaint relates in detail.[2] In 1975, Ford directed Byrne and Car Carriers to sell the assets and business to a second Ford carrier. After Car Carriers had entered into negotiations for a sale with the E & L Transport Co. ("E & L"), however, Ford "unreasonably interfered with and prevented" the consummation of the agreement by inducing the corporate parent of E & L to repudiate an executed letter of intent. Complaint ¶ 20(a). In 1977 and 1978, Ford induced Car Carriers to purchase over $6,000,000 worth of new tractor-trailer equipment with the promise that Car Carriers "would be able to recover the cost of such equipment with additional transport business and *higher* tariff rates." Complaint ¶ 20(b) (emphasis added). However, during the entire period of 1975 to 1981, Ford caused Car Carriers's operations in Chicago to be unprofitable through its "refusal to allow adequate published tariff rates or other compensation" for Car Carriers and by "refusing to allow adequate temporary rate adjustments." Complaint ¶ 20(g).

In 1979, Ford prevented Car Carriers from acquiring the outstanding stock of Automobile Transport, Inc. ("ATI"), which was at that time Ford's carrier in Wayne, Michigan and other areas. This action by Ford "prevented a carrier consolidation which would have generated valuable back-

haul business and resulted in significant operating efficiencies and cost reduction benefits" to ATI, Car Carriers, and Ford. Complaint ¶ 20(c). Later that year, Ford terminated ATI and awarded the substantial portion of ATI's business to Nu-Car and E & L on the basis of "sham and knowingly predatory bids." Complaint ¶ 20(e).

In 1981, Ford solicited bid proposals for Chicago haulaway services from Car Carriers and other Ford transporters. In October of that year, Ford terminated Car Carriers and awarded the haulaway contract for the Chicago area to Nu-Car on the basis of the latter's "sham and knowingly predatory bid." Complaint ¶ 20(h). To minimize the losses from the termination, Car Carriers attempted to sell its facilities and other assets to Nu-Car. However, the effort was frustrated when Ford and Nu-Car insisted on "walkaway and other onerous provisions . . . as well as unacceptable covenants and releases" of Car Carriers's claims against Ford, Nu-Car, and Associated Transport, Inc.; Nu-Car eventually constructed its own terminal facility near the Ford plant on land provided by Ford. Complaint ¶ 20(i).

### B

In lieu of filing an answer, the defendants moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The district court, finding that the plaintiffs lacked "antitrust standing," granted the defendants' 12(b)(6) motion. Concluding that the "inherent internal flaws" in the antitrust claim were "non-curable," the court dismissed Count I with prejudice and the remaining counts without prejudice. 561 F.Supp. 885 at 889 & n. 12. The final judgment dismissing the entire action was entered on April 7, 1983.

On April 27, 1983, the plaintiffs filed a "Motion for Leave to File an Amended Complaint." The district court denied the

---

**2.** We have, of course, provided the facts as presented in the complaint. Notwithstanding the initial general pleadings set out above, our review must focus on the specific allegations relating to the downfall of the plaintiffs.

motion as untimely under Rule 59(e) and as insufficient under Rule 60; a subsequent motion for reconsideration was denied. The plaintiffs then filed a notice of appeal from the initial order dismissing the complaint, the order denying leave to amend, and the order denying reconsideration.[3]

## II

### A

#### 1.

Before discussing Car Carriers's substantive claims, we must first consider the function of 12(b)(6) procedures in the context of antitrust litigation. We acknowledge the Supreme Court's statement in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that a complaint should be dismissed for failure to state a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 45–46, 78 S.Ct. at 101–102. Nonetheless, as this court has recognized, *Conley* has never been interpreted literally. *Sutliff, Inc. v. Donovan Cos.*, 727 F.2d 648, 654 (7th Cir.1984). In practice, "a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under *some* viable legal theory." *Id.* at 654 (quoting *In re Plywood Antitrust Litig.*, 655 F.2d 627, 641 (5th Cir. 1981), *cert. dismissed,* —— U.S. ——, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983)).

We also note that the Supreme Court has stated that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). However, we have previously concluded that, despite its sweeping language, *Poller* and its progeny simply stand for the proposition that, if a claim under the antitrust laws has been adequately set forth in the complaint, the highly factual and subjective questions of intent and purpose should be resolved after discovery and trial. *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 553 (7th Cir.1980).

 Thus, in the context of a 12(b)(6) challenge, the question is whether, if we accept all the allegations—including those relating to purpose and intent—as true, the plaintiffs have successfully pleaded a contract, combination, or conspiracy in restraint of trade within the meaning of the Sherman Act. The pleader may not evade these requirements by merely alleging a bare legal conclusion; if the facts "do not at least outline or adumbrate" a violation of the Sherman Act, the plaintiffs "will get nowhere merely by dressing them up in the language of antitrust." *Sutliff, supra,* 727 F.2d at 654. When the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint. A contrary view would be tantamount to providing antitrust litigation with an exemp-

---

**3.** Jurisdiction in the district court could only be based on Count I. Due to the dismissal of that count, the court below was required to dismiss the remaining claims under *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The appellants have not disputed this part of the decision and we, therefore, focus solely on the propriety of the dismissal of Count I.

We note that, on April 6, 1984, the plaintiffs filed in the district court a "Conditional Motion To Vacate Judgment Entered April 7, 1983 Pursuant to Fed.R.Civ.Pro. 60(b)(1) and (2)." This appeal was argued before this court on April 9,

1984. On May 31, 1984, the district court entered an order denying the April 6 motion. Apart from the transmission of the motion papers as a supplement to the record on appeal subsequent to oral argument before this court, this second Rule-60 motion was not raised as an issue and has not been briefed by the parties in this appeal. The district court's denial of the motion, is therefore, not before us. Even if we were to review that decision, however, we would be in full agreement with the lower court's conclusion that the April 6 motion was without merit.

tion from Rule 12(b)(6). *Havoco, supra,* 626 F.2d at 553. *Cf. Associated Gen. Contractors of Calif. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 903 n. 17, 74 L.Ed.2d 723 (1983) (suggestion that "district court must retain power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed").

### 2.

■■■ In view of the district court's disposition, we must also discuss the scope of the record on a motion to dismiss for failure to state a claim. In its ruling, the court below "flesh[ed] out" the complaint by relying on the expanded statements in the plaintiffs' memoranda. 561 F.Supp. at 886 n. 2. However, it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss. *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 526 (S.D.N.Y.1977); *Sansom Comm. v. Lynn,* 366 F.Supp. 1271, 1278 (E.D.Pa.1973); *Chambliss v. Coca-Cola Bottling Corp.,* 274 F.Supp. 401, 409 (E.D.Tenn.1967), *aff'd on other grounds,* 414 F.2d 256 (6th Cir.1969), *cert. denied,* 397 U.S. 916, 90 S.Ct. 1231, 25 L.Ed.2d 433 (1970). Similarly, consideration of a motion to dismiss is limited to the pleadings. *Hill v. Trustees of Ind. Univ.,* 537 F.2d 248, 251 (7th Cir.1976); *accord Martin v. Morgan Drive Away, Inc.,* 665 F.2d 598, 602 n. 1 (5th Cir.), *cert. dismissed,* 458 U.S. 1122, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982). Thus, it may have been questionable for the district court to have relied on the plaintiffs' briefs to embellish the conclusory allegations of the complaint. This action was in no way prejudicial to the plaintiffs, however, as the lower court was using the briefs to examine and consider every reasonable presumption in the plaintiffs' favor. Nonetheless, in this appeal we limit our review, as we must, to the well-pleaded allegations of the complaint.

### B

### 1.

■■■ We now consider the substantive allegations that must be present in order for this complaint to state a claim under § 1. The fundamental requirement at issue in this dispute is that of a sufficient allegation of anticompetitive effects that would result or have resulted from the defendants' actions; the absence of such allegations is ordinarily fatal to the existence of a cause of action.[4] *Havoco, supra,* 626 F.2d at 554. The purpose of the Sherman Act is to rectify the injury to consumers caused by diminished competition; it is for this reason that Congress provided a treble damage recovery for private parties willing to initiate an enforcement action. *Id.* at 555. Thus, the plaintiff must allege, not only an injury to himself, but an injury to the market as well. As we stated in *Sutliff, supra,* 727 F.2d at 655:

> The legislators who passed the Sherman Act did not make ordinary business torts federal torts for which treble damages could be recovered; no such wholesale displacement of state tort law into the federal courts was contemplated or desired .... Their concern, at least as it has been understood in recent cases, was with practices that by making the market less competitive hurt the people buying

---

**4.** We initially note that the allegations of the concerted action required to state a claim under § 1 of the Sherman Act are dangerously weak. Unilateral action, of course, is not a violation of § 1. *Monsanto Co. v. Spray-Rite Serv. Corp.,* —— U.S. ——, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Standing alone, the boilerplate recitation of a conspiracy in ¶ 19 of the complaint is insufficient to withstand a motion to dismiss. *Havoco, supra.* The remainder of Count I appears to allege only unilateral action by either Ford or Nu-Car. In addition, it is inherently

implausible that Ford, which is alleged to have total control over its carriers, would conspire with Nu-Car to eliminate Car Carriers so that Nu-Car could later charge Ford non-competitive prices. Similarly, it is implausible that other carriers would band together to eliminate the plaintiffs when, given the exclusive nature of the contract with Ford, only one of these competitors could prevail. However, mindful of the Supreme Court's admonition in *Poller, supra,* we do not base our decision on a finding that the allegations of concerted action were deficient.

from or selling to the firms in those markets.

*See also Hunt v. Crumboch,* 325 U.S. 821, 826, 65 S.Ct. 1545, 1547, 89 L.Ed. 1954 (1945) (Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce"); *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Assoc., Inc.,* 672 F.2d 1280, 1288 (7th Cir.1982); *Contractor Util. Sales Co. v. Certain-Teed Prods. Corp.,* 638 F.2d 1061, 1078 n. 21 (7th Cir.1981) ("The losers [in the marketplace] must prove more than just their loss in order to secure relief under the antitrust laws."); *Havoco, supra,* 626 F.2d at 558–59.

■■■ It is only when the plaintiff adequately states a *per se* violation of § 1 of the Sherman Act that an allegation of anticompetitive effects is not required. *Havoco, supra,* 626 F.2d at 555. It is not that such effects need not exist in order to establish the elements of such a violation, but rather that conduct constituting a *per se* violation is viewed by the law as so inimical to free competition that the pernicious effects are conclusively presumed; stated in another manner, *per se* violations of the antitrust laws are anticompetitive by definition. Examples of such offenses include price-fixing schemes, as well as certain types of group boycotts, market allocations, and tying arrangements. *Id.* We also note that the Supreme Court has in its most recent decisions cautioned against the precipitate application of the *per se* doctrine. As the Court stated in *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–1563, 60 L.Ed.2d 1 (1979), a practice could only be considered a *per se* violation if its effect and purpose was "to threaten the proper operation of our predominantly free-market economy," that is, if the practice "facially appears to be one that would always or almost always tend to restrict competition and decrease output." *See also Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Thus, the *per se* label

must be applied with caution and we will expand that class of violations "only after the courts have had considerable experience with the type of conduct challenged and application of the Rule of Reason has inevitably resulted in a finding of anticompetitive effects." *Havoco, supra,* 626 F.2d at 555.

■■■ Although their argument is less than clear, the plaintiffs apparently maintain that the activities alleged in the complaint constitute a *per se* violation. In support of their argument, the plaintiffs have referred us to decisions condemning vertical and horizontal agreements for resale price maintenance, as well as concerted refusals to deal. Of course, the plaintiffs' attachment of the *per se* label is simply inadequate in itself to sustain the complaint; the defendants' alleged activity must be scrutinized to determine whether such a characterization is appropriate. *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1284 (7th Cir. 1983). After considering the allegations, we find that the lines of authority relied upon by the plaintiffs are simply inapposite and that no *per se* violation has been alleged.

■■■ First, only those vertical arrangements that accompany or implement a price-fixing scheme are considered *per se* violations; other vertical arrangements must be tested under the Rule of Reason. *Monsanto Co. v. Spray-Rite Serv. Corp.,* —— U.S. ——, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *Continental T.V., supra.* The plaintiffs have not alleged a price-fixing scheme, and price-cutting by Car Carriers was in no way a factor in its dispute with Ford. *Cf. Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.,* 691 F.2d 241, 245 (6th Cir.1982). In fact, the clear inference is that Car Carriers continually sought to raise its prices. In addition, the market structure described in the complaint is not analogous to a hierarchy of manufacturer, distributors, and resellers. Ford is simply a purchaser of hauling services and the plaintiffs are sellers of those services.

The invocation of decisions finding *per se* violations in concerted refusals to deal is also unavailing. It is well settled in this circuit that "group boycotts" are considered a *per se* violation only if they are used to enforce agreements that are themselves illegal *per se*. *See Vogel v. American Soc'y of Appraisers*, 744 F.2d 598 at 600 (7th Cir.1984); *Products Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 663 (7th Cir.1982); *United States Trotting Ass'n v. Chicago Downs Ass'n*, 665 F.2d 781, 787–90 (7th Cir.1981) (*en banc*); *Contractor Util., supra*, 638 F.2d at 1072 n. 9. The complaint fails to suggest in any way that the object of the alleged conspiracy constituted a price-fixing scheme, a tying arrangement, or a market allocation. To the contrary, the complaint simply states that Ford elected to replace its exclusive haulaway transporter for the Chicago area with another carrier on the grounds that the original carrier continually sought higher prices that Ford was unwilling to pay. Ford obviously entered into an "agreement" with Nu-Car that resulted in the elimination of Car Carriers, but the same could be said of any similar exclusive arrangement when the original supplier of services is replaced by another.

The allegations relating to Car Carriers' attempt to sell its assets after its termination by Ford are also insufficient. The plaintiffs allege only that the parties could not come to an agreement on the terms for the sale. It would indeed be inappropriate, especially in view of the admonitions of the Supreme Court discussed above, to find that the insistence of Ford and Nu-Car on "walkaway and other onerous provisions ... as well as unacceptable covenants and releases" called for the application of the *per se* rule. *Cf. Dunn & Mavis, supra*, 691 F.2d at 243.[5]

**2.**

Having determined that the activities alleged in the complaint do not rise to the level of a *per se* violation, we must next consider the question whether the allegations state a claim under the Rule of Reason. *Havoco*, 626 F.2d at 556. The fatal flaw in these pleadings is the absence of any allegation, either direct or inferential, of an anticompetitive effect. In this regard, it is important to note that the egregiousness of the defendants' behavior does not, by itself, constitute a violation of § 1. Tortious activities in the form, for example, of unfair competition do not contravene the antitrust laws unless accompanied by the requisite anticompetitive effect. Losing business to a competitor is an inevitable consequence of the economic system that the Sherman Act was designed to protect; some enterprises will prevail and others will not, but it is the function of § 1 to compensate the unfortunate only when their demise is accompanied by a generalized injury to the market. *Havoco, supra; Dunn, supra*. As the Supreme Court has aptly stated, the antitrust laws were designed to protect competition, not merely competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

As noted above, it is inherently implausible that Ford, as a buyer that could "dictate[ ] and control[ ]" the tariffs of its suppliers of transportation services, would conspire in order to allow its new carrier, Nu-Car, to charge noncompetitive prices; the plaintiffs are alleging, in essence, that Ford conspired to injure itself. Similarly, given the exclusive nature of the services Car Carriers provided to Ford, it is implausible that other carriers would band together in order to eliminate Car Carriers, if only one member of the "conspiracy" could prevail.

Even if we look beyond this, however, the complaint does not in any way set forth

**5.** The plaintiffs' bald reference to "sham" and "predatory" bids states no more than a legal conclusion and the complaint provides no explanation of these terms. As noted above, such allegations are legally insufficient. Moreover, it would be improper for us to attempt to conjure up some sort of tenable antitrust scheme for these cryptic allusions. Needless to say, they cannot serve as a foundation for a *per se* violation of § 1.

facts to support the conclusion that this putative conspiracy had any anticompetitive effect. Specifically, there are no allegations that, having terminated Car Carriers in favor of Nu-Car, Ford was compelled, or would be compelled, to pay prices that were not the result of the competitive process. There are also no allegations that the quality or quantity of the haulaway services in the Chicago area deteriorated. Quite to the contrary, the clear implication is that Car Carriers was terminated because it continually sought higher tariffs that Ford was unwilling to pay and that Ford was dissatisfied with the quality and quantity of Car Carriers's services. Having attempted to work with Car Carriers to rectify the problem, Ford then solicited bids for the services and Nu-Car simply provided a lower price. Stated differently, the injury that Car Carriers has alleged appears to be the result of procompetitive activity.

 The confusing allegation of a "sham and knowingly predatory" bid from Nu-Car does not alter our conclusion. As noted above, invocation of antitrust terms of art does not confer immunity from a motion to dismiss; to the contrary, these conclusory statements must be accompanied by supporting factual allegations. The plaintiffs' statements provide no more than a legal conclusion. Even if we ignore this lacuna, however, the facts actually alleged render unlikely any "predatory" bidding by Nu-Car. First, if this was in fact a unilateral act by Nu-Car, it does not state a claim under § 1, because the requirement of concerted activity has not been satisfied. *Monsanto, supra.* If we assume that there actually was concerted activity between Ford and Nu-Car, the "predatory" bid becomes utterly implausible. In considering a motion to dismiss, the court is not required to don blinders and to ignore commercial reality. *Havoco, supra.* If Ford absolutely controls the rates charged by its suppliers, it is preposterous to assume that Ford would conspire with Nu-Car to eliminate Car Carriers by accepting Nu-Car's "predatory" bid so that the latter could later charge noncompetitive, monopo-

ly prices. The complaint characterizes Ford as a buyer that was highly concerned about the prices it paid; it would be unusual indeed for Ford now to conspire with Nu-Car to accept a "predatory" bid with Ford to become the victim. It would be contrary to the principles set forth above to find that, in view of the other deficiencies of this complaint, the unadorned and conclusory allegation of a "predatory" bid would allow this pleading to withstand a motion to dismiss.

The complaint does not amplify the statement that the bid was a "sham." As noted above, if this was a unilateral act by Nu-Car, no claim under § 1 has been alleged. If Ford and Nu-Car improperly manipulated the bidding process, then Car Carriers may have a claim grounded in tort or contract; the absence of any allegation of an anticompetitive effect prevents these claims from coming within the purview of the antitrust laws.

We find that the Sixth Circuit's characterization in *Dunn & Mavis, supra,* aptly applies to the case before us: "When stripped to its essential allegations, the complaint does no more than state plaintiffs' commercial disappointment at losing [Ford's] patronage." 691 F.2d at 243. A finding that these allegations stated a claim under § 1 of the Sherman Act would severely limit "a buyer's right to displace an old seller in favor of a new one" and "would undermine the principles of competition the antitrust laws were designed to secure." *Id.* at 244. We also note this court's observation in *Havoco, supra,* that it is "hard to ignore the suspicion that the facts have been forced into an antitrust mold to achieve federal jurisdiction." 626 F.2d at 559.

In conclusion, the dismissal of the original complaint was correct and will be affirmed.

### III

### A

Having determined that the original complaint failed to state a claim upon which

relief could be granted, we now consider the plaintiffs' argument that the district court, after dismissing the entire action, erred in refusing to grant the plaintiffs leave to amend their original complaint. The plaintiffs maintain that, under Rule 15(a) of the Federal Rules of Civil Procedure, they have an absolute right to amend as a matter of course if the defendants have not filed a responsive pleading. We disagree.

Rule 15(a) provides in relevant part that: A party may amend his pleading once as a matter of course at any time before a responsive pleading is served .... Otherwise a party may amend his pleading only by leave of the court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

The plaintiffs, relying on the literal language of the Rule, assert that only the filing of a responsive pleading extinguishes the right to amend as a matter of course. Although the language of Rule 15(a) taken in isolation is susceptible to the reading that the right to amend once as a matter of course survives a dismissal of the action, this court has not so construed the Rule. The plaintiffs' reading of the decisions of this circuit is inaccurate and their argument represents a misunderstanding of the fundamental distinction between the dismissal of the action in its entirety and the dismissal of the complaint.

■ It is well settled in this circuit that a motion to dismiss is not a "responsive pleading" within the meaning of Rule 15(a). *See Northlake Community Hosp. v. United States,* 654 F.2d 1234, 1240 (7th Cir.1981); *Fuhrer v. Fuhrer,* 292 F.2d 140, 142 (7th Cir.1961). Similarly, the dismissal of the complaint is not a final appealable order. *United States ex rel. Kelly v. Bibb,* 255 F.2d 772, 773–74 (7th Cir.1958). When the original complaint alone is dismissed, the litigation has not been terminated and the plaintiff still retains his right to amend once as a matter of course under Rule 15(a). *Peterson Steels, Inc. v. Seidmon,* 188 F.2d 193 (7th Cir.1951).

■ That right does not, however, survive a dismissal of the entire action. *See Northlake, supra,* 654 F.2d at 1240 (plaintiff "was entitled to amend its complaint 'as a matter of course' any time prior to the dismissal of the action"); *Swam v. United States,* 327 F.2d 431 (7th Cir.1964), *cert. denied,* 379 U.S. 852, 85 S.Ct. 98, 13 L.Ed.2d 55 (1964). Once the district court has dismissed the suit, two courses of action are open to the plaintiff: (1) he may appeal the judgment or (2) he may seek leave to amend under Rule 15(a) after having the judgment reopened under either Rule 59 or 60. *Swam, supra,* 327 F.2d at 433. *See also* 3 Moore's Federal Practice ¶ 15.10 at 15–144 to 45 (2d ed. 1984) ("The better view is that after a judgment of dismissal plaintiff must move under Rules 59(e) or 60(b) to reopen the judgment."); 6 Wright & Miller, Federal Practice and Procedure § 1489 at 445 (1971) ("Most courts ... have held that once the judgment is entered the filing of an amendment cannot be allowed until the judgment is set aside or vacated under Rule 59 or Rule 60."). This represents a compromise between the liberal amendment policy of the Federal Rules and the general judicial policy relating to quiescence and the finality of judgments.

The three decisions of this court upon which the plaintiffs rely simply stand for the proposition that the plaintiff may amend without first seeking leave of the district court at any time after the original *complaint* has been dismissed. *See Jafree v. Barber,* 689 F.2d 640 (7th Cir.1982); *Fuhrer v. Fuhrer,* 292 F.2d 140 (7th Cir. 1961); *Peterson, supra.* The primogenitor in the line of decisions to which the plaintiffs refer is, of course, *Peterson, supra.* In that case, after the district court had dismissed the complaint, the plaintiff filed a motion for leave to amend; the court denied the motion and terminated the litigation. This court held that the denial was reversible error, as the plaintiff had a right to amend under 15(a) as a matter of course after the initial dismissal of the complaint. However, neither this decision nor the oth-

ers cited by the plaintiffs stand for the proposition that this right to amend as a matter of course survives a dismissal of the entire *action,* for in those cases only the original complaint had been dismissed when the respective plaintiffs sought to amend.

B

■ We now turn to the facts of this case. Because the district court dismissed the action, rather than simply the complaint, the plaintiffs' right to amend as a matter of course under Rule 15(a) was extinguished. They therefore had to seek leave to amend after reopening the judgment by way of either a Rule 59(e) or Rule 60(b) motion. Thus, the district court was correct in characterizing the April 27 motion as such an attempt.

■ A Rule 59(e) motion must be made "not later than 10 days after entry of the judgment" and no extension of time is permitted. Fed.R.Civ.P. 6(b), 59(e). Because the motion was made more than ten days after the judgment dismissing the action, it was untimely. With reference to the Rule 60 portion of the motion, we agree with the court below that the reasons proffered by the plaintiffs, i.e., that they sought to expand the allegations in the original complaint, did not fall within the six categories listed in the Rule and were, therefore, insufficient. In their appeal, the plaintiffs have offered no serious argument to the contrary. Thus, as in *Swam, supra,* the motion for leave to amend was a "nullity," 327 F.2d at 434, and the decision of the district court to deny leave to amend was correct.

The judgment is in all respects AFFIRMED.