**TERRIFIC PROMOTIONS, INC., Pamela J. Alper, and Michael N. Alper, Plaintiffs,**

v.

**DOLLAR TREE STORES, INC., and Timothy J. Avers, Defendants.**

No. 96 C 2230.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 27, 1996.

Opinion Denying Reconsideration Dec. 10, 1996.

**1244**

Robert Patrick Cummins, John A. Sopuch, Mark D. Rasmussen, Megyn M. Kelly, Bickel & Brewer, Chicago, IL, for Terrific Promotions, Inc., for Pamela J. Alper.

Robert Patrick Cummins, John A. Sopuch, Mark D. Rasmussen, Megyn M. Kelly, Bickel & Brewer, Chicago, IL, for Michael N. Alper.

Terry F. Moritz, Steven A. Levy, Hans Ulrich Widmaier, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL, Beth Hirsch Berman, William F. Devine, Robert C. Nusbaum, Hofheimer, Nusbaum, McPhaul & Samuels, P.C., Norfolk, VA, for Dollar Tree Stores, Inc.

Alan Jay Mandel, Chicago, IL, for Timothy J. Avers.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Plaintiff Terrific Promotions, Inc., a Delaware corporation ("TPI–DE"), and its owners Michael and Pamela Alper ("the Alpers") bring this action alleging that defendant Dollar Tree Stores ("DTS") violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1996), by fraudulently inducing the Alpers to sell Terrific Promotions, Inc., an Illinois corporation ("TPI–IL"), to DTS; that DTS and Timothy Avers, the former manager of wholesale operations at TPI–IL, conspired to harm competition in the national wholesale merchandising market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and that DTS and Avers made fraudulent misrepresentations, breached their confidentiality and non-competition agreements, perpetuated a civil conspiracy, engaged in unfair competition, misappropriated confidential business information, and breached fiduciary duties all in violation of Illinois state law. Defendants DTS and Avers have moved the court to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(6), and, for the reasons set forth below, their motions to dismiss will be granted.

### CONTROLLING LEGAL STANDARD

The court may grant a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). When reviewing a motion to dismiss, the court must take every well-pleaded allegation in the complaint as true

and make all reasonable inferences in favor of the plaintiff. *Oswalt v. Godinez*, 894 F.Supp. 1181, 1184 (N.D.Ill.1995) (citation omitted). The following recitation of facts is set forth in conformity with this standard and is therefore adopted solely for purposes of the motion to dismiss.

## FACTUAL BACKGROUND

In 1986, plaintiffs Michael and Pamela Alper launched TPI–IL with a single retail shop selling a variety of low-priced consumer goods, and within ten years the company had grown into a national chain of 136 "Dollar Bill$" stores. In 1993, the Alpers decided to expand their company to include a wholesale merchandising business. A wholesale merchandiser is one who purchases consumer goods directly from various manufacturers, generally at some below-wholesale discount rate, and then resells those goods to wholesalers at prices that are higher than what the wholesale merchandiser paid but lower than what the wholesaler usually pays. Unlike a retailing operation, the essence of a successful wholesale merchandising business consists in "confidential and proprietary information relating to sources of supply, distribution channels, customer base, pricing and timing factors, and other relationships central to their business." 2d Am. Compl., ¶ 12. Despite the functional difference between the wholesale merchandising and retail operations of TPI–IL, however, both elements of the corporation were represented by a single class of common stock and were therefore legally indistinct.

In July of 1993, the Alpers hired defendant Timothy Avers to head up their wholesale merchandising business. As a condition of his employment, Avers signed an agreement ("Avers Agreement") that contained both a confidentiality and non-competition clause. In relevant part, the confidentiality clause provided that

during my employment and after the termination thereof for whatever reason, I shall hold and keep secret the Proprietary Information as to which I at any time during my employment shall become informed, and I shall not directly or indirectly disclose any such information to any person, firm, governmental agency, corporation, partnership or any other entity or use the same except in connection with the business and affairs of the Company.

Avers Agreement, ¶ 3. The non-competition clause provided that Avers would not compete with either the retail or wholesale merchandising operations of TPI–IL within a radius of seventy-five miles of an existing TPI–IL store and for a period of two years following the termination of his employment with that company. Avers Agreement, ¶ 4.

The Alpers personally owned of all of the capital stock in TPI–IL, and in September of 1995 they entered into negotiations to sell all or part of the company to defendant DTS. Pursuant to these negotiations, the Alpers entered into a confidentiality agreement with DTS on October 5, 1995 ("DTS Agreement"). The agreement provided that DTS would maintain the confidentiality of any TPI–IL business information that it received in connection with the purchase negotiations. DTS Agreement, ¶ 1. The agreement further provided that, for a period of two years beginning on October 5, 1995, DTS would not "initiate or maintain contact with ... any officer, director or employee of [TPI–IL] ... regarding, directly or indirectly, the business operations, prospects or finances of the Company" and that it would not "directly or indirectly solicit the employment of, or employ such officer, director or employee, except with the express written permission of [TPI–IL]." DTS Agreement, ¶ 8.

As a result of these negotiations, during which both TPI–IL and DTS were represented by legal counsel, the parties signed an Agreement for the Purchase and Sale of Stock on January 16, 1996 ("Stock Purchase Agreement"). In this agreement, the Alpers contracted to sell all of their stock in TPI–IL to DTS for a price of $53,345,000. Stock Purchase Agreement, Arts. 1, 2.1.1. Notably, the agreement provided that the "understandings, representations and/or covenants" contained in the DTS Agreement would "terminate and be of no further effect or force" upon the closing of the transaction. *Id.* at Art. 7.10. The transaction was closed on January 31, 1996.

Although the Alpers conveyed one hundred percent of the stock of TPI–IL to DTS in the Stock Purchase Agreement, they now claim that they intended to retain ownership of all proprietary business information relating to the wholesale merchandising portion of the business. They allege that the transaction "was documented as a stock sale but was treated and valued as a sale of assets which specifically excluded any value attributable to the intangible assets and property of the Alpers' wholesale merchandising business." 2d Am. Compl., ¶ 36. They allege that DTS made numerous representations during the course of the negotiations and through the closing of the transaction that it would acquire only the retail portion of TPI–IL and would not interfere with the wholesale operations. Moreover, the Alpers claim that defendant Avers promised to remain in their employment as the manager of their new wholesale merchandising business.

In reliance on these representations, the Alpers incorporated TPI–DE on January 30, 1996, one day before the closing of the stock sale, as a vehicle for continuing their wholesale merchandising business. Their plan never came to fruition. Plaintiffs believe that at some point between the public announcement of the stock sale on January 16, 1996, and the closing of the transaction on January 31, 1996, Avers secretly agreed to work for DTS and disclosed proprietary business information to that company about TPI–IL's wholesale merchandising business. Thus, immediately after closing the stock transaction, the Alpers found themselves deprived of the key personnel and confidential information necessary to operate TPI–DE as a profitable wholesale merchandising firm.

The Alpers advance numerous legal claims in their bid to recover their wholesale merchandising business. In Count I, they allege that the stock sale harmed competition in violation of the Sherman Act, 15 U.S.C. § 1 et seq., by reducing the number of competitors in the national wholesale merchandising market. In Count II, they allege that DTS fraudulently induced them to sell their stock by misrepresenting that they would be able to retain the wholesale merchandising business, all in violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5. In Counts III through XIII, all of which are based on state law, the Alpers allege that DTS and Avers made fraudulent misrepresentations, breached their confidentiality and non-competition agreements, perpetuated a civil conspiracy, engaged in unfair competition, misappropriated confidential business information, and breached various fiduciary duties. Plaintiffs seek actual, compensatory, consequential and punitive damages of not less than $10,000,-000; treble damages pursuant to 15 U.S.C. § 15; an injunction barring defendants from interference with the Alpers' wholesale merchandising business; specific performance of all contracts; a declaration releasing the Alpers from all agreements barring them from the pursuit of future business ventures; and attorneys' fees and costs.

## DISCUSSION

### A. Antitrust Violations

In Count I, plaintiffs allege that defendants DTS and Avers engaged in a conspiracy to eliminate competition in the wholesale merchandising market in violation of the Sherman Act, 15 U.S.C. § 1 et seq. In order to state a claim under the Sherman Act, plaintiffs must allege that defendants engaged in acts that produced an anticompetitive effect. See Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1109 (7th Cir.1984) ("[t]ortious activities in the form . . . of unfair competition do not contravene the antitrust laws unless accompanied by the requisite anticompetitive effect"). To demonstrate anticompetitive effect, plaintiffs must allege both injury to themselves and injury to the market. Id. at 1107. This rule is rooted in the principle that the antitrust laws are intended to protect competition and not merely competitors. Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

Plaintiffs allege that DTS and Avers conspired to subvert competition in the national wholesale merchandising market by decreasing the overall number of wholesale merchandising firms in the United States. Specifically, they argue that "absent defendants' unlawful conduct, there would be more

competitors in the wholesale market today (*i.e.*, the business of TPI and the Alpers would not have been destroyed.)" Pls.' Mem. in Opp'n to Def. DTS's Mot. to Dismiss, p. 16. Notably, however, the number of firms in the national wholesale merchandising market did not actually decrease at the time of the stock purchase, for DTS did not compete in that market prior to its acquisition of TPI–IL. Indeed, plaintiffs have conceded that "DTS was [not] forbidden from *entering* the national consumer product wholesale market as a competitor [at the time of the stock purchase]" (emphasis added). *Id.* at 16 n. 64. The transaction did not result in a net loss of firms to the market, then, because DTS merely replaced the Alpers as the owner TPI–IL's wholesale merchandising business. Presumably, plaintiffs wish to argue that DTS and Avers merely prevented the number of competitors from increasing. Indeed, the Alpers suggest that this occurred in two ways.

First, plaintiffs allege that DTS and Avers destroyed TPI–DE by misappropriating confidential information that was essential to the success of that business. In order to establish that this misappropriation prevented the number of wholesale merchandising firms from increasing, however, plaintiffs would need to show that both DTS and TPI–DE would be in the market had the improper acts not occurred. This cannot be done. By making a claim of misappropriation, plaintiffs assert that they have an exclusive right to the disputed business information, a right that is not shared by DTS. Regardless of whether plaintiffs win or lose their state law misappropriation claim, then, the market will be left with only one wholesale merchandiser. The misappropriation could not have prevented the number of market competitors from increasing.

Second, plaintiffs allege that they were induced to enter restrictive covenants that barred them from reentering the wholesale merchandising business. 2d Am. Compl., ¶ 54. It appears, however, that plaintiffs can cite no specific contract provisions to support this allegation. In fact, the Non–Competition Agreement appended to the Stock Purchase Agreement specifically allows the Alpers to rehire their former wholesale merchandising employees and to compete with DTS in that market. While Section 1.3.2 of the Non–Competition Agreement bars the Alpers from engaging in certain retail operations, it specifically authorizes them to pursue "the wholesale sale or distribution of goods." And while Section 2.2.3 of that agreement precludes the Alpers from rehiring certain TPI–IL employees, it specifically allows them to rehire wholesale employees. *Id.* at § 2.2.3. Plaintiffs have therefore failed to demonstrate that they are subject to any restrictive covenants that prevent them from competing with DTS in the wholesale merchandising market.

Thus, plaintiffs have failed to allege that they were unlawfully restrained from competing against DTS in the national wholesale merchandising market either by virtue of restrictive covenants or by the misappropriation of confidential business information. Inasmuch as plaintiffs' antitrust claim rests on the premise that the number of wholesale merchandising firms in the United States would be higher but for their impermissible exclusion from the market, this claim must fail. Count I of the second amended complaint will therefore be dismissed.

### B. *Securities Fraud*

In Count II, the Alpers allege that DTS fraudulently induced them to sign the Stock Purchase Agreement by making intentional misrepresentations about the nature of the transaction, thereby violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1996). Plaintiffs allege that, among other things, DTS misrepresented the transaction by stating that it would not (1) acquire or interfere with any aspect of TPI–IL's wholesale merchandising business, (2) hire or solicit the employment of any TPI–IL wholesale merchandising employee, (3) use confidential business information relating to TPI–IL's wholesale merchandising operations, or (4) initiate or maintain contact with any TPI–IL employee concerning TPI–IL's business operations. Plaintiffs further allege that DTS failed to notify them that it would not honor these "conditions precedent" to the stock sale.

In order to state a claim under Rule 10b–5, a plaintiff must allege that the defendant "(1) made an untrue statement of a material fact that rendered the statement made misleading; (2) in connection with a securities transaction; (3) with the intent to mislead; and (4) which caused [the plaintiff's] loss." *Branch–Hess Vending Servs. Employees' Pension Trust v. Guebert,* 751 F.Supp. 1333, 1340 (C.D.Ill.1990), *citing Schlifke v. Seafirst Corp.,* 866 F.2d 935, 943 (7th Cir.1989). Where a plaintiff unjustifiably relies on a material misrepresentation, however, the misrepresentation can no longer be said to have caused the plaintiff's loss. *Branch–Hess,* 751 F.Supp. at 1340–41. The Alpers cannot claim that they were fraudulently induced to sign the Stock Purchase Agreement, then, if they had reason to know that DTS's statements did not accurately reflect the nature of that agreement.

It is well established that the unambiguous terms of a written agreement supersede any previous discussions concerning the meaning or effect of that agreement. Thus, the Seventh Circuit has observed that "no suit for securities fraud can be maintained on the basis of oral representations plainly inconsistent with written ones." *Wolin v. Smith Barney, Inc.,* 83 F.3d 847, 851 (7th Cir.1996); *see also Branch–Hess,* 751 F.Supp. at 1341; *Schlifke,* 866 F.2d at 944; *In the Matter of VMS Limited Partnership Securities Litigation,* 803 F.Supp. 179, 195 (N.D.Ill.1992). Indeed, plaintiffs concede that where "documents clearly and flatly repudiate prior fraudulent misrepresentations, reliance upon such misrepresentations may be declared unreasonable as a matter of law." Pls.' Mem. in Opp. to Def. DTS's Mot. to Dismiss, p. 24 n. 88 (emphasis omitted).

■ The parties do not dispute that the Alpers sold one hundred percent of the stock of TPI–IL to DTS. As a matter of law, this transaction conveyed ownership of the entire corporate entity from the Alpers to DTS. *See, e.g., Brodsky v. Frank,* 342 Ill. 110, 173 N.E. 775, 777 (1930) ("sale of all of the stock of a corporation is, in legal effect, a sale of all of its assets"). The Alpers retained only those portions of TPI–IL that were clearly identified in the carve-out provisions of the Stock Purchase Agreement. The court must therefore decide whether the Stock Purchase Agreement provided that the Alpers would retain those portions of TPI–IL that they now claim were misappropriated by DTS. In particular, it is necessary to determine whether the agreement bars DTS from using TPI–IL's wholesale business information and from hiring Avers.

Plaintiffs argue that Article 5.3.1 of the Stock Purchase Agreement, whereunder they reserved the right to use all TPI–IL "trade names, trademarks and service marks, including the goodwill associated respectively therewith," should be construed as an "express retention of their wholesale merchandising business customers and employees— including but not limited to defendant Avers." Pls.' Mem. in Opp. to Def. DTS's Mot. to Dismiss, p. 25 (emphasis omitted). To support this argument, plaintiffs cite *In re Bay Plastics, Inc. v. BT Commercial Corp.,* 187 B.R. 315, 330 n. 24 (Bankr.C.D.Cal.1995), which suggests that goodwill encompasses whatever "advantageous relationships" may exist between a corporation and its customers and employees. The concept of goodwill does not, however, give a corporation the right to maintain exclusive relationships with its customers and employees. Consequently, the Alpers merely retained the right to benefit from whatever customers and employees would choose voluntarily to do business with their enterprise as a result of the goodwill associated with the TPI trade name.

■ Moreover, plaintiffs suggest that DTS was barred from using TPI–IL's wholesale merchandising information and from hiring Avers by virtue of Article 7.8 of the Stock Purchase Agreement, which provided that the Alpers would retain their wholesale merchandising inventory after closing the transaction. On its face, however, this carve-out provision relates only to physical inventory rather than to intangible business information. While the existence of such a contract term suggests that the Alpers intended to reenter the wholesale merchandising business, a fact not in dispute, it does not clearly establish that DTS was barred from using TPI–IL's wholesale merchandising business information. Indeed, the Stock Purchase

Agreement contained no analogous carve-out provision for intangible business information.

■ Finally, plaintiffs argue that sections 2.2.3 and 1.3.2 of the Non–Competition Agreement appended to the Stock Purchase Agreement clearly establish that DTS had no right to use TPI–IL's proprietary wholesale merchandising information or to hire Avers. Once again, plaintiffs' argument must fail. While these sections give the Alpers the right to reenter the wholesale merchandising market and to rehire its wholesale merchandising employees, they cannot be said to prevent DTS from using information concerning TPI–IL's wholesale retailing operations or from hiring Avers.

■ In short, there is nothing on the face of the Stock Purchase Agreement which provides that DTS was forbidden from hiring Avers or from using TPI–IL's wholesale business information. As a matter of law, then, the Alpers were not justified in relying on DTS's representations concerning the meaning of the Stock Purchase Agreement because those representations were contradicted by the plain terms of the written agreement. As sophisticated business persons assisted by counsel, the Alpers could not reasonably have assumed that the Stock Purchase Agreement would result in anything other than the sale of the entire corporation, subject only to the explicit carve-out provisions included in the agreement. Inasmuch as plaintiffs have therefore failed to demonstrate that any misrepresentations by DTS caused their injury, they have failed to state a viable securities fraud claim under Section 10(b) and Rule 10b–5. Thus, Count II of the second amended complaint will be dismissed.

### C. *Pendent State Claims*

Plaintiffs allege a variety of supplemental state law claims in addition to their federal antitrust and securities fraud claims. Congress has authorized the federal courts to exercise supplemental jurisdiction over state law claims so long as they form part of the same "case or controversy" as the claims over which they have original jurisdiction.

28 U.S.C. § 1367. The statute further provides, however, that a court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c)(3). *See also Korzen v. Local Union 705, Int'l Bhd. of Teamsters,* 75 F.3d 285, 289 (7th Cir.1996) (federal courts should relinquish supplemental jurisdiction over state law claims when they dismiss the claims over which they have original jurisdiction). This is certainly the proper course here. Having dismissed both the federal antitrust and securities fraud claims, then, the court will now dismiss the state law claims for lack of subject matter jurisdiction.

ORDERED: Counts I and II of plaintiffs' second amended complaint are dismissed with prejudice pursuant to Fed.R.Civ.P. 12(b)(6); the court declines to exercise supplemental jurisdiction over Counts III through XIII pursuant to 28 U.S.C. § 1367 and therefore dismisses these counts without prejudice.

### MEMORANDUM OPINION AND ORDER

Plaintiffs Terrific Promotions, Inc., a Delaware corporation ("TPI–DE"), Michael N. Alper, and Pamela J. Alper ("the Alpers") have filed a Rule 59(e) motion for reconsideration of the court's order of November 26, 1996, dismissing with prejudice their federal antitrust and securities fraud claims against defendants Dollar Tree Stores, Inc. ("DTS") and Timothy J. Avers ("Avers"), and declining to exercise jurisdiction over their supplemental state law claims. For the reasons set forth below, their motion for reconsideration is denied.

### *FACTUAL SUMMARY* [1]

This litigation relates to a corporate acquisition in which defendant DTS purchased one hundred percent of the stock of Terrific Promotions, Inc., an Illinois corporation ("TPI–IL"), from the Alpers for a sum of more than $53 million. The Alpers claim that they did not intend to convey any proprietary business information relating to TPI–IL's whole-

1. The complete factual background of this matter is set forth in the court's memorandum opinion of November 26, 1996, and is repeated here only in brief.

sale merchandising operations, even though the Stock Purchase Agreement contained no provisions excluding that portion of the company from the sale. Plaintiffs now seek to recover the exclusive use of that business information by claiming that the transaction violated federal antitrust and securities laws.

## DISCUSSION

A motion for reconsideration pursuant to Fed.R.Civ.P. 59(e) enables the court to correct its own "manifest error[s] of law or fact" and thus "avoid unnecessary appellate procedures." *Moro v. Shell Oil Co.,* 91 F.3d 872, 876 (7th Cir.1996). It does not provide a vehicle for a party "to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Id.* As set forth below, plaintiffs argue that the court committed errors of law and fact in dismissing their antitrust and securities fraud claims. After reviewing these suggestions of error, however, the court remains persuaded that these claims were properly dismissed.

### A.

Plaintiffs allege that defendants DTS and Avers conspired to harm competition in the national wholesale merchandising market[2] in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The substance of this claim may be stated as follows: (1) the Stock Purchase Agreement did not convey to DTS any business information concerning TPI–IL's wholesale merchandising business, and thus the current use of such information by DTS is a misappropriation, (2) the misappropriation resulted in the entry of DTS into the wholesale merchandising market by "unlawful means" and the "destruction" of TPI–DE, an "existing competitor" and the successor to TPI–IL's wholesale merchandising operations (Pls.' Mot. for Recons. at 5), and (3) the misappropriation harmed competition in the national wholesale merchandising market because, without it, "there would be more competitors in [that] market today" (Pls.' Mem.

in Opp'n to Def. DTS's Not. to Dismiss at 16).

The court dismissed the antitrust claim because plaintiffs could prove no set of facts to support their allegation that the misappropriation or anything else about the transaction harmed competition in the national wholesale merchandising market. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (Section 1 of the Sherman Act requires harm to the market and not merely harm to competitors). In order to demonstrate that the transaction had any effect on the market whatsoever, plaintiffs would need to show either (1) that it reduced the number of competitors in the market, or (2) that it hindered the number of competitors from increasing. Because DTS was not present in the wholesale merchandising market prior to the stock sale, its alleged misappropriation of the Alpers' wholesale merchandising business could not have reduced the overall number of market competitors.

Plaintiffs would therefore need to show that the transaction hindered the number of competitors from increasing. To do this, plaintiffs would need to show that the misappropriation or some other facet of the transaction imposed a burden on the Alpers' reentry into the market that was greater than the burden that DTS would have realized in entering the market for the first time. This cannot be done. The redundant development costs imposed on the Alpers by virtue of the misappropriation could be no greater than those incurred by DTS in entering the market for the first time, and for this reason the alleged misappropriation could not have hindered the number of market competitors from increasing. The court further determined that the Alpers were not subject to any non-competition agreements that restricted their reentry into the national wholesale merchandising market in competition with DTS. For these reasons, the court held that plaintiffs could prove no set of facts to support their claim that the transaction suppressed competition.

---

**2.** All references to the "national wholesale merchandising market" are adopted solely for purposes of the motion to dismiss and the current

motion to reconsider. They do not constitute a finding that such a market is appropriate for subsequent analysis of plaintiffs' antitrust claim.

Plaintiffs suggest that this reasoning contained three errors of law or fact. First, they argue that the court should not have dismissed their antitrust claim under Fed. R.Civ.P. 12(b)(6) because they clearly "alleged" injury to the market in their complaint. Indeed, plaintiffs alleged that defendants DTS and Avers engaged in "unlawful conspiracy to harm competition in the wholesale merchandising business." (2d Am. Compl. at ¶¶ 53–54.) While plaintiffs may have "alleged" injury to the market, a bare allegation is insufficient to overcome a motion to dismiss under Rule 12(b)(6) where plaintiffs "can plead no facts that would support [their] claim for relief." *Palda v. General Dynamics Corp.*, 47 F.3d 872, 874 (7th Cir.1995), *citing Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957). Because plaintiffs can prove no facts to show that the transaction harmed competition in the national wholesale merchandising market, their antitrust claim was properly dismissed.

Second, plaintiffs assert that the court erroneously relied on a finding that the Alpers were not barred from reentering the national wholesale merchandising market, a fact which they contend is not "dispositive" in a claim under Section 1 of the Sherman Act. (Pls.' Mot. for Recons. at 5.) Rather, plaintiffs suggest that they need only show that defendant DTS "suppressed" competition by "destroying" TPI–DE. (*Id.* at 5–6.) It would seem, however, that plaintiffs misperceive the manner in which the court "relied" on such a finding. The fact that the Alpers were not barred from reentering the market by virtue of non-competition agreements is but one reason why the transaction did not "suppress" competition. As has been shown, the alleged destruction of TPI–DE by DTS can provide no further evidence of the suppression of competition in the national wholesale merchandising market.

■ Third, plaintiffs suggest that the court misconstrued paragraph 54 of their second amended complaint, which alleges that unspecified "restrictive covenants solidified the adverse market consequences" of the antitrust conspiracy. The court interpreted this statement as an assertion that the Al-

pers were subject to restrictive covenants that barred them from reentering the wholesale merchandising market directly; it then observed that no such covenants exist. Plaintiffs have clarified that paragraph 54 refers to the Non–Competition Agreement appended to the Stock Purchase Agreement, the effect of which was to prevent the Alpers from engaging in certain retail (but not wholesale) operations in competition with DTS for a period of four years after the stock sale. Plaintiffs now argue that their limited exclusion from the retail market tangentially encumbers their wholesale operations "by arguably limiting certain proof of performance sales." (Pls.' Mot. for Recons. at 6 n. 17).

The legality of a non-competition agreement under Section 1 of the Sherman Act is properly governed by the "rule of reason" analysis. *Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 (7th Cir.1981) *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Under this rule, covenants are valid if they are "(1) ancillary to the main purpose of a lawful contract, and (2) necessary to protect the covenantee's legitimate property interests, which require that the covenants be as limited as is reasonable to protect the covenantee's interests." *Id.* at 265. Moreover, a plaintiff must be able to show that the non-competition agreement produces an anticompetitive market effect. *Id.* at 268–269.

Without reaching the factual question of market effects, the court may safely conclude as a matter of law that the Non–Competition Agreement does not violate Section 1 of the Sherman Act under the rule set forth in *Lektro–Vend.* Inasmuch as the agreement was ancillary to the legitimate business transaction consummated by the Stock Purchase Agreement, it clearly satisfies the first prong of the test. While plaintiffs assert that there is a "justiciable controversy" as to the enforceability of the Non–Competition Agreement "in light of the fraud perpetrated by DTS" (2d Am. Compl. at ¶ 131), the possibility of fraudulent inducement does not touch upon the substantive reasonableness of the restrictions contained in the contract for purposes of antitrust liability. Inasmuch as plaintiffs have not alleged that the Non–

Competition Agreement is unreasonable on its own terms, the court must now conclude that the contract does not violate Section 1 of the Sherman Act.

### B.

Plaintiffs further allege that they were fraudulently induced to enter into the Stock Purchase Agreement in violation of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5 (1996). They claim that they signed the agreement in reliance on numerous misrepresentations by DTS that it would not "interfere with or acquire [the wholesale merchandising] business or hire its employees." (Pls.' Mot. for Recons. at 9.) The court dismissed this claim for the reason that plaintiffs were not, as a matter of law, justified in relying on such misrepresentations because the actual effect of the transaction was spelled out in plain terms in the Stock Purchase Agreement.

Plaintiffs suggest that the court reached this conclusion in error. They argue that they were justified in relying on DTS's misrepresentations because the Stock Purchase Agreement did not "explicitly" and "completely" contradict these representations. (*Id.* at 8.) Plaintiffs assert that the Stock Purchase Agreement did not provide that DTS would acquire "both the retail and wholesale merchandising businesses of TPI–IL." (*Id.* at 9.) Once again, the court disagrees. As a matter of law, a written agreement to sell one hundred percent of the stock in a corporation conveys ownership of the entire corporate entity (in this case both the wholesale merchandising and retail operations of TPI–IL) unless the agreement explicitly excludes some portion of the company from the transaction. *See Brodsky v. Frank,* 342 Ill. 110, 173 N.E. 775, 777 (1930). Inasmuch as the parties did not exclude the wholesale merchandising operations of TPI–IL from the sale, the plain terms of the Stock Purchase Agreement explicitly and completely contradicted DTS's prior assertions that it would not acquire that portion of the company. *See H Enterprises Int'l v. General Electric Capital,* 833 F.Supp. 1405, 1423 (D.Minn. 1993) (reliance on representations unjustified when written contract explicitly and completely contradicts prior representations).

### C.

In summary, plaintiffs can prove no facts to support their allegations that defendants DTS and Avers committed violations of the federal antitrust or securities laws in conjunction with the purchase of TPI–IL. For this reason, the court must now deny plaintiffs' motion for reconsideration of the court's order of dismissal of November 26, 1996.

ORDERED: Plaintiffs' motion for reconsideration of the court's order of dismissal of November 26, 1996, is denied.