DANCOR INTERNATIONAL, LTD., Plaintiff-Appellant, v. FRIEDMAN, GOLDBERG AND MINTZ, Defendant-Appellee (Pam Accounting Services, Inc., Defendant).

First District (3rd Division)   No. 1—94—2999

Opinion filed May 21, 1997.

David A. Novoselsky & Associates, of Chicago (David A. Novoselsky and Kevin S. Besetzny, of counsel), for appellant.

Clausen Miller, P.C., of Chicago (James T. Ferrini and Edward M. Kay, of counsel), for appellee.

JUSTICE GORDON delivered the opinion of the court:

Dancor International, Ltd. (Dancor), the plaintiff, takes this interlocutory appeal from the dismissal of its accountant malpractice action filed against Friedman, Goldberg & Mintz (Friedman), the defendant. See 155 Ill. 2d R. 304(a). The trial court granted Friedman's section 2—619 motion to dismiss (735 ILCS 5/2—619 (West 1992)), finding that Dancor's lawsuit had not been filed within the applicable statute of limitations period. Dancor appeals from that dismissal order and from the trial court's denial of its motion to reconsider or vacate the dismissal order. For the reasons discussed below, we affirm the dismissal.

On March 24, 1993, Dancor filed a four-count complaint. Counts I and II, which were directed at defendant Friedman,[1] respectively alleged breach of contract and professional negligence. Both counts were premised on Friedman's alleged failure, as Dancor's certified public accountants during the period of January 1987 through August 1990, to detect warehouse fraud and embezzlement committed by Arthur Corrigan, Dancor's minority shareholder, officer, director and employee, who maintained Dancor's corporate books, and Linda McGuire, Dancor's office manager and secretary. The fraud and embezzlement allegedly occurred from 1984 through the summer of 1990; and the amounts embezzled totaled approximately $1,279,000. Dancor alleged in its complaint against Friedman that Friedman was employed to audit, monitor, and issue a report regarding all the

[1]Counts III and IV were directed at defendant Pam Accounting Services, Inc., which is not a party to this appeal.

books, checks and records maintained in the ordinary course of Dancor's business. Dancor further alleged, *inter alia*, that Friedman failed to discover and investigate forgeries on checks drawn on Dancor's accounts; altered amounts on checks drawn on Dancor's accounts; discrepancies between payees listed in the disbursement journal and the check stubs and the actual payees and endorsers of checks; check stubs marked "void" but that were actually cashed; and checks written on Dancor's accounts for reimbursable business expenses but that were actually for nonreimbursable personal expenses. Dancor also alleged that Friedman failed to verify warehouse statements of inventory on hand and negligently relied upon warehouse confirmations or correspondence.

On May 25, 1993, Friedman moved to dismiss Dancor's complaint because it was not filed within the time limits of section 13—214.2 of the Code of Civil Procedure (the Code), which provides that actions against persons or entities registered under the Illinois Public Accounting Act (225 ILCS 450/0.01 *et seq.* (West 1994)) must be "commenced within 2 years from the time the person bringing [the] action knew or should reasonably have known of such act or omission" (735 ILCS 5/13—214.2(a) (West 1992)). Friedman argued that Dancor knew or should have known of Friedman's alleged acts or omissions on October 10, 1990, the date Dancor filed its federal lawsuit against Corrigan alleging RICO violations (Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq.* (1994))), fraudulent misrepresentation, breach of fiduciary duty and breach of contract. Friedman argued that since Dancor's complaint was filed on May 23, 1993, rather than by October 10, 1992, it exceeded the two-year period provided by section 13—214.2 and thus was subject to dismissal under section 2—619(a)(5) of the Code (735 ILCS 5/2—619(a)(5) (West 1992)).

Attached to Friedman's motion was a copy of Dancor's 1990 federal complaint against Corrigan. That complaint, which was 35 pages long, alleged 226 specific fraudulent acts by Corrigan, including, *inter alia*, use of corporate checks for personal expenses, fictitious payees, forgeries, and altered amounts on checks. Each of those alleged fraudulent acts contained specific information as to the date of the check; the recorded amount and the altered amount, where applicable; the named payee and the actual payee; and the recorded reason for the payment and the actual reason for the payment.

In response to Friedman's motion, Dancor argued that Friedman had fraudulently concealed its accounting malpractice by failing to provide Dancor with all of Dancor's records and work papers in August 1990 after Friedman resigned as Dancor's accountants. See 735 ILCS 5/13—215 (West 1992) ("[i]f a person liable to an action

fraudulently conceals the cause of action, \*\*\* the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has a cause of action, and not afterwards"). Dancor argued that due to Friedman's concealment of Dancor's accounting records, it did not discover that it had a cause of action against Friedman until August 1991 when its new accountants, Berger, Goldstein & Company (Berger, Goldstein), received enough documentation upon which to form its professional opinion that a viable cause of action existed against Friedman. In support of this argument, Dancor attached the affidavit of James A. Spear, of Berger, Goldstein. In that affidavit Spear stated that, in August 1990, he began working on Dancor's financial statements and did not have any of Friedman's work papers or client records. He stated that, in the fall of 1990, Friedman forwarded account analyses and working trial balances and that those papers did not indicate any ground for a malpractice action. Spear also stated that, at his direction, a letter was sent to Friedman on August 21, 1990, requesting its work sheets for the December 31, 1989, working trial balance. Spear averred that Friedman did not send "workpapers [*sic*] concerning testing of transactions and internal control \*\*\* [which] would have revealed the failure to perform certain tests necessary to issue a certified accounting opinion." He also stated that Friedman did not comply with a subsequent request to turn over the remainder of its papers on January 16, 1991. Spear averred that in June, July and August 1991, additional papers were forthcoming through various sources, including the Du Page County State's Attorney, who was investigating Corrigan. He concluded by stating:

> "[T]he earliest that I was able to form any professional opinion, based upon local accounting standards, as to the existence of a possible viable cause of action against [Friedman] for accounting malpractice was August, 1991, when I received papers necessary to evaluate possible litigation against [Friedman] on accounting malpractice."

Friedman in reply reargued that, on October 10, 1990, when Dancor filed its federal action against Corrigan, Dancor knew or should have known of Friedman's failure to discover Corrigan's alleged fraudulent activities and that Friedman's failure to do so served as the basis for a potential cause of action for professional negligence. Friedman also denied that it refused to promptly provide accounting records to Dancor, contending instead that it "produced all of the documents plaintiff was entitled to by December 5, 1990." In support of that contention, Friedman attached the affidavit of John Kallergis, a partner with the Friedman firm. Kallergis stated that, prior to

Friedman's resignation, it had provided Dancor with "audited financial statements, unaudited financial statements for fiscal year ended February 28, 1987 and our 1987 inventory analysis *** at the time they were prepared." Kallergis also stated that, as of December 5, 1990, pursuant to a deposition subpoena filed in Dancor's federal action against Corrigan, he produced the following documents to Dancor: Dancor's internal work papers; adjusting journal entries prepared by Dancor and any adjusting journal entries prepared by Friedman; Dancor's financial statement prepared by Dancor and Friedman; Dancor's corporation and pension plan income tax returns prepared by Friedman; and individual income tax returns for Daniel Frawley and Arthur Corrigan, principals of Dancor, prepared by Friedman. Kallergis further averred in pertinent part as follows:

> "4. Pursuant to my understanding of the Court's ruling at the time, I did not produce Friedman, Goldberg & Mintz's audit procedures, checklists and internal memoranda. Additionally, I 'whited out' Friedman, Goldberg & Mintz's notes written in the margins of various documents prepared by others. *** In other words, I did not produce our internal notes and conclusions relating to Dancor's internal books and records. All of Dancor's workpapers [sic], however, with our notes deleted, were produced.
>
> 5. I did not withhold any documents which I understand [sic] to be the property of Dancor."

On September 17, 1993, the trial court granted Friedman's motion to dismiss. The court found that the information Dancor had in its possession on October 10, 1990, which enabled it to file a 35-page civil federal RICO lawsuit against Corrigan alleging 226 separate fraudulent check transactions, was enough to put Dancor on notice of a potential claim against Friedman.

Dancor filed its motion to reconsider or, in the alternative, to clarify the order of September 17, 1993. Dancor argued that although it was aware that it had suffered an injury on October 10, 1990, it did not know at that time and reasonably should not have known until August 1991 that the injury was wrongfully caused by Friedman. In the alternative, Dancor argued that the statute of limitations should not be applied to preclude recovery of its entire $3.5 million *ad damnum* but only to the $1,500,000 damages that were known to exist on October 10, 1990, when Dancor filed its federal action against Corrigan.

Attached to Dancor's motion to reconsider were the affidavits of John Kinsella, an assistant State's Attorney for Du Page County, who was assigned to criminally prosecute Arthur Corrigan; and Daniel Frawley, Dancor's president. Kinsella stated in his affidavit

that, on or about January 18, 1991, and not before, his office obtained possession of Dancor's business records, including all original bank checks, all computer records, bank statements, expense reports and cash receipt journals. Kinsella also stated that those records remained in the possession of the State's Attorney's office or in the criminal court and would be returned after final sentencing of Corrigan.

The Frawley affidavit stated that in August 1990, when Friedman and Dancor severed their business relationship, Friedman failed to turn over Dancor's complete accounting records; that Friedman turned over a portion of those records pursuant to a deposition subpoena in the federal RICO action; that after certain requests, Friedman turned over portions of Dancor's records during June and July 1991; and that by August 1991, Dancor acquired a large share of Dancor's own records by inspecting and copying Dancor's "original records," which were in the possession of the Du Page County State's Attorney's office. Frawley averred that it was not until August 1991 that Dancor determined that it had been injured by the acts and/or omissions of Friedman.

On August 1, 1994, the court denied Dancor's motion to reconsider and clarified its dismissal ruling, stating that the dismissal order extended to the entire $3,500,000 *ad damnum* prayed for against Friedman.

On appeal, Dancor argues that the trial court improperly dismissed its action on the basis of the running of the statute of limitations period provided in section 13—214.2 of the Code. Dancor contends that the limitations period was tolled under the discovery rule and by Friedman's fraudulent concealment of the cause of action against it. Dancor further argues that even if the statute of limitations expired, it did so only with respect to the claims relating to Corrigan's embezzlement of $1,500,000 and not with respect to the remaining $2 million in damages discovered by Dancor's accountants after October 10, 1990, the date of filing of the federal action against Corrigan.

■ As provided in section 13—214.2, an accounting malpractice action must be commenced within two years from the time the person bringing the action knew or reasonably should have known of the act or omission. 735 ILCS 5/13—214.2 (West 1992). This statutory provision has incorporated within it a discovery rule, which delays commencement of the statute of limitations until the plaintiff knows or reasonably should have known of the injury and that it may have been wrongfully caused. See *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 651 N.E.2d 1132 (1995); *Waters v. Reingold,*

278 Ill. App. 3d 647, 663 N.E.2d 126 (1996); *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240, 633 N.E.2d 627 (1994). The effect of the discovery rule is to postpone the starting of the limitations period. *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 430 N.E.2d 976 (1981). When a plaintiff uses the discovery rule to delay commencement of the statute of limitations, the burden is on the plaintiff to prove the date of discovery. *Hermitage Corp.*, 166 Ill. 2d 72, 651 N.E.2d 1132.

■ In the case at bar, Dancor argues that it did not know and reasonably could not have known of Friedman's negligent conduct and malpractice until it received a professional opinion to that effect from Berger, Goldstein in August 1991. Dancor contends that, in a professional malpractice action, knowledge for purposes of the discovery rule does not exist until a professional opinion is rendered as to the deviation from the standard of care. We disagree. The discovery rule has never been interpreted to delay commencement of the statute of limitations until a person acquires actual knowledge of negligent conduct. Rather, it has been interpreted to delay commencement until the person has a reasonable belief that the injury was caused by wrongful conduct, thereby creating an obligation to inquire further on that issue. As stated in *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 170-71, 421 N.E.2d 864, 868 (1981):

> "We wish to emphasize that the rule we announce is not the same as a rule which states that a cause of action accrues when a person knows or should know of both the injury and the defendants' negligent conduct. Not only is such a standard beyond the comprehension of the ordinary lay person to recognize, but it assumes a conclusion which must properly await legal determination. [Citation.] Moreover, if knowledge of negligent conduct were the standard, a party could wait to bring an action far beyond a reasonable time when sufficient notice has been received of a possible invasion of one's legally protected interests. (See Restatement (Second) of Torts sec. 7 (1965) (definition of an injury)). Also, such a rule would be contrary to the underlying purpose of statutes of limitations, which is to 'require the prosecution of a right of action within a reasonable time to prevent the loss or impairment of available evidence and to discourage delay in the bringing of claims.' [Citations.]
>
> We hold, therefore, that when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed. In that way, an injured person is not held to a standard of knowing the inherently unknowable

[citation], yet once it reasonably appears that an injury was wrongfully caused, the party may not slumber on his rights."

Accord *Hermitage Corp.*, 166 Ill. 2d 72, 651 N.E.2d 1132; *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 416, 430 N.E.2d 976, 980 (1981) ("[t]he term 'wrongfully caused' *** must be viewed as a general or generic term, and not a term of art. *** [T]he term does not connote knowledge of negligent conduct or knowledge of the existence of a cause of action").

■ Based upon *Nolan* and its progeny, we reject Dancor's contention that the statute of limitations did not begin to run until its new accountants rendered a professional opinion in August 1991 that Friedman's acts and omissions deviated from the standard of care. The discovery rule became operative and the statute of limitations began to run on October 10, 1990, when Dancor had enough information to put it on notice that it was injured and that that injury may have been wrongfully caused by Friedman. The facts are undisputed that on October 10, 1990, Dancor had enough information to file a 35-page federal RICO complaint against Corrigan alleging warehouse fraud and embezzlement. See *Hermitage Corp.*, 166 Ill. 2d 72, 651 N.E.2d 1132; *Smith v. Cook County Hospital*, 164 Ill. App. 3d 857, 518 N.E.2d 336 (1987) (point at which injured person becomes possessed of sufficient information concerning its injury and cause can be decided as a matter of law where facts are undisputed and only one conclusion may be drawn from them). As discussed above, that federal complaint contained 226 separate and specific allegations of fraudulent check transactions, allegations that contained information as to names of payees and endorsers, recorded amounts and altered amounts, recorded reasons for payments and actual reasons for payments, and checks recorded as void but that were actually cashed. That same information was used by Dancor to support its allegations and charge of malpractice in the instant case. Dancor charged Friedman, a certified public accounting firm hired by Dancor to audit and monitor its books and records, with the failure to properly audit and monitor the same records and checks having the same payees and endorsers, the same dates, the same altered or divergent amounts and the same reasons.

Based upon those records, Dancor unquestionably had sufficient knowledge to cause it to inquire further of a possible actionable wrong by Friedman in failing to detect the falsity of the accounting entries made by Corrigan. This is especially true here, where the underlying federal complaint filed by Dancor demonstrated that Dancor was aware in great detail of the embezzlement scheme and the documentation supportive of that scheme. It would make no sense to

presume that the paper trail that formed the basis for Dancor's federal action and its detection of Corrigan's embezzlement scheme could not also suffice to put Dancor on notice that Friedman was negligent in failing to detect Corrigan's misconduct. While Dancor may not have had full knowledge on October 10, 1990, that, in the opinion of its expert, Friedmans' acts and omissions amounted to a breach of the standard of care, it is clear that the knowledge Dancor did possess at that time was sufficient to put it on notice of Friedman's possible invasion of Dancor's legally protected rights. See *Nolan*, 85 Ill. 2d at 171, 421 N.E.2d at 868. See also *Hermitage Corp.*, 166 Ill. 2d at 86-87, 651 N.E.2d at 1139 (in action for negligent preparation of mechanic's lien, under discovery rule, statute of limitations commences on date when "plaintiffs were on notice *** that they had a problem with the mechanic's lien"). At that point, Dancor was required to investigate and inquire further with its new accountants and experts, Berger, Goldstein. See *Nolan*, 85 Ill. 2d 161, 421 N.E.2d 864 (obligation to inquire and pursue causes of action eliminates delay in bringing claims, the very purpose of limitations periods). Under the discovery rule provision of section 13—214.2, Dancor had two years from October 10, 1990, to make that inquiry and to file its cause of action against Friedman before that action became time barred on October 10, 1992.

■ Dancor next contends that the statute of limitations was tolled by Friedman's fraudulent concealment of the cause of action as evidenced by Friedman's failure to return Dancor's work papers and records. Section 13—215 of the Code of Civil Procedure provides in pertinent part:

> "If a person liable to an action fraudulently conceals the cause of such action, *** the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards." 735 ILCS 5/13—215 (West 1992).

The concealment of a cause of action sufficient to toll the statute of limitations requires affirmative acts or representations designed to prevent discovery of the cause of action or to lull or induce a claimant into delaying the filing of his claim. *E.g., Chicago Park District v. Kenroy, Inc.*, 78 Ill. 2d 555, 402 N.E.2d 181 (1980); *Foster v. Plaut*, 252 Ill. App. 3d 692, 625 N.E.2d 198 (1993); *Smith*, 164 Ill. App. 3d 857, 518 N.E.2d 336. The alleged acts or representations must in fact prevent inquiry or discovery of the claim or lull or induce a claimant into delaying the filing of his claim. *Waters v. Reingold*, 278 Ill. App. 3d 647, 660, 663 N.E.2d 126, 136 (1996) (fraudulent concealment allegation must be supported by "facts of affirmative acts or misrepresen-

tations by the defendant which were designed to prevent and in fact did prevent the discovery of the claim").

■ Here, the submissions of the parties create a dispute as to whether and when Friedman had returned all of Dancor's work papers and records. However, even assuming Friedman failed to return some of Dancor's records, Friedman's acts of omission did not prevent Dancor from discovering its claim against Friedman. As noted above, at the time Dancor filed its federal RICO action against Corrigan, in October 1990, Dancor had sufficient knowledge of Corrigan's warehouse fraud and embezzlement scheme and of the more than 200 fraudulent check transactions orchestrated by Corrigan. The extensive and specific allegations in the federal complaint show that Dancor possessed financial records that revealed discrepancies between the check entries made by Corrigan and the actual checks showing different payees, endorsers, and amounts. Dancor's allegations in the federal complaint also showed that Dancor possessed records that contradicted the recorded reasons for the check payments and the actual reasons for those payments. In fact, as stated above, the financial information that Dancor relied upon to support its lengthy and detailed allegations in the federal complaint serve as support for Dancor's allegations in the instant complaint. If Dancor was able to discern Corrigan's fraudulent scheme based upon that financial information, it would be reasonable for Dancor to question Friedman's inability to do so when Friedman, as a certified public accounting firm, was engaged in the business of auditing and monitoring books, records, and checks kept in the ordinary course of business.

■ We further note that the fraudulent concealment statute does not apply to a party who by ordinary care could have discovered the concealed information. *County Board of School Trustees of Du Page County ex rel. Hinsdale Township High School District No. 86 v. An Ass'n of Franciscan Fathers*, 49 Ill. App. 3d 686, 364 N.E.2d 691 (1977) (no fraudulent concealment where report could have been obtained from newspaper or by pursuing a motion to produce); *Nogle v. Nogle*, 53 Ill. App. 2d 457, 465, 202 N.E.2d 683 (1964). See *Smith*, 164 Ill. App. 3d 857, 518 N.E.2d 336. Here, as discussed above, Dancor had served a deposition subpoena upon John Kallergis, a partner at the Friedman firm, on October 26, 1990, in which it requested that Kallergis produce "all documents related to Dancor, including, without limitation, working papers, audits, financial statements, reports, correspondence, and billing papers." Kallergis averred in his affidavit filed in the instant case that, pursuant to his understanding of the court's ruling in the federal case, he produced all of Dancor's work

papers with Friedman's marginal notes deleted and did not produce Friedman's audit procedures, checklists and internal memoranda. If Friedman had not fully complied with that deposition subpoena, Dancor could have moved for a court order mandating compliance and/or filed a rule to show cause. In addition, Daniel Frawley, Dancor's president, averred in his affidavit that by August 1991, Dancor had acquired a large share of its records by inspecting and copying Dancor's "original records," which were in the possession of the Du Page County State's Attorney's office. Those records, however, had been in the possession of the State's Attorney's office since January 1991, according to the affidavit of John Kinsella, a Du Page County assistant State's Attorney. Thus, since Dancor, through ordinary diligence, could have acquired the documents and papers alleged to have been fraudulently concealed by Friedman, Dancor cannot avail itself of the fraudulent concealment rule. See *County Board of School Trustees*, 49 Ill. App. 3d 686, 364 N.E.2d 691.

■ Dancor's final argument on appeal is that the court erroneously dismissed its entire claim totalling $3.5 million. Dancor contends that the statute of limitations expired only as to the damages known to exist in October 1990, namely the $1.5 million embezzled by Corrigan, and not with respect to the remaining $2 million in damages discovered after October 10, 1990, the date of filing of the federal RICO action against Corrigan. Initially, we note that Dancor has not cited any authority in support of this argument and, as such, has waived that argument on appeal. See 155 Ill. 2d R. 341(e)(7) (argument shall contain reasons and citation of authorities); *Bank of Illinois v. Thweatt*, 258 Ill. App. 3d 349, 630 N.E.2d 121 (1994).

Notwithstanding this waiver, we further note that Dancor's contention is without merit. As discussed above, the discovery rule delays commencement of the applicable statute of limitations period until the plaintiff knows or should have known of an injury and that it may have been wrongfully caused. *E.g., Hermitage*, 166 Ill. 2d 72, 651 N.E.2d 1132. The mere fact that the extent of injury is not immediately known or ascertainable does not postpone the triggering of the statute of limitations. *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 657 N.E.2d 894 (1995). In *Golla*, which presented a similar issue, the plaintiff brought a products liability action against the manufacturer of her automobile almost four years after she had been injured in an automobile collision. The defendant moved to dismiss, asserting that the plaintiff's action was barred under the applicable two-year statute of limitations period (Ill. Rev. Stat. 1991, ch. 110, par. 13—202 (now 735 ILCS 5/13—202 (West 1994))). The plaintiff, in reliance

on the discovery rule, argued that, although she was aware of her initial injury at the time of the collision, she was unaware of the ultimate extent of her damages, *i.e.*, a latent injury that manifested itself thereafter. The court rejected plaintiff's argument and barred her action, stating:

> "The plaintiff here does not claim that she was unaware of any injury at the time of the accident or that she was unaware of the causal connection between that injury and the allegedly defective automobile seat. Rather, she claims that, at the time of her initial injury, she was unaware of the ultimate extent of damages she sustained. This court has never suggested that plaintiffs must know the full extent of their injuries before the statute of limitations is triggered." *Golla*, 167 Ill. 2d at 364, 657 N.E.2d at 899-900.

Here, Dancor, as the plaintiff in *Golla*, alleges that it did not know of the full extent of its injuries in October 1990. However, on October 10, 1990, Dancor did know that it had suffered an injury of some magnitude and was put on notice that its injury may have been wrongfully caused by Friedman. As a result, the statute of limitations began to run as to its entire claim on October 10, 1990. See *Golla*, 167 Ill. 2d 353, 657 N.E.2d 894.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNULTY and HOURIHANE, JJ., concur.