**Pamela J. ALPER and Michael N. Alper, Plaintiffs,**

v.

**ALTHEIMER & GRAY, an Illinois general partnership, Myron Lieberman, individually, and Robert L. Schlossberg, individually, Defendants.**

No. 97 C 1200.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 31, 1999.

Robert Patrick Cummins, Megyn M. Kelly, Bickel & Brewer, Chicago, IL, for plaintiffs.

Jeffrey D. Colman, Thomas P. Sullivan, Jenner & Block, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

PALLMEYER, District Judge.

Until January 1996, Plaintiffs Pamela and Michael Alper were the owners of Terrific Promotions, Inc. (TPI), a discount merchandising business. In 1996, the Alpers transferred their interest in TPI to Dollar Tree Stores (DTS) for fifty-three million dollars. The Chicago law firm of Altheimer & Gray and two Altheimer attorneys, Robert Schlossberg and Myron Lieberman, represented the Alpers in this transaction. According to the Alpers, however, they intended to sell only their retail business and never intended to transfer their wholesale merchandising business. The Alpers claim that, contrary to their wishes, Defendants drafted an agreement that transferred both businesses to DTS and enabled DTS to acquire key personnel and business information from TPI.

This transaction gone awry has led to multiple lawsuits and a tortured procedural history. In a nutshell, the Alpers sued DTS and Timothy Avers, a former TPI employee who went to work for DTS, in state court in 1996 for a variety of claims including fraud, breach of contract, civil conspiracy, and unfair competition. Ultimately, the Alpers voluntarily dismissed that suit. Shortly before doing so, however, the Alpers sued DTS and Avers in federal court for violation of federal securities and antitrust laws, as well as state law causes of action which were the same as

those the Alpers had pleaded in state court. Judge Lindberg dismissed the federal claims and declined to exercise supplemental jurisdiction over the state law claims. *Terrific Promotions, Inc. v. Dollar Tree Stores,* 947 F.Supp. 1243 (N.D.Ill. 1996). The Alpers, residents of Florida, then filed the instant diversity action against Defendants in federal court on February 21, 1997.

The Alpers originally had eight claims against Defendants, but they have withdrawn four of them. What remains are claims for fraud (Count I), violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count II), professional negligence (Count III), and breach of fiduciary duty (Count VIII). Defendants have moved for summary judgment on Counts III and VIII, claiming that the Alpers' legal malpractice claim is premature. Judge Norgle, who was first assigned this case, referred this motion as well as several others to Magistrate Judge Denlow. Judge Denlow heard oral argument, but then recused himself, and the referral was transferred to Magistrate Judge Ashman. Judge Ashman also heard oral argument,[1] but before he made any ruling the motions were transferred to newly-appointed Magistrate Judge Nolan. On February 22, 1999, Judge Nolan issued a report and recommendation (R & R)[2] that Defendants' motion for summary judgment be denied. Defendants and the Alpers have filed objections to this recommendation. This court must "make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which a specific written objection has been made." FED.R.CIV.P. 72(b). For the rea-

sons set forth below, Defendants' motion for summary judgment is denied.

## FACTUAL BACKGROUND

In the absence of any objection from the parties as to its particulars, the court adopts Judge Nolan's factual summary,[3] as follows.

### A. The Parties

The Alpers are citizens and residents of Florida. First Am.Cmplt. ¶¶ 2, 3. Defendant Altheimer & Gray ("Altheimer" or "A & G") is a law firm organized as an Illinois partnership with its principal place of business located at 10 South Wacker Drive, Chicago, Illinois 60606. *Id.* ¶ 4. Myron Lieberman ("Lieberman") and Robert L. Schlossberg ("Schlossberg") are residents and citizens of Illinois and partners of Altheimer. *Id.* ¶¶ 5, 6.[1] Thus, federal jurisdiction is premised on diversity of citizenship pursuant to 28 U.S.C. § 1332.

---

1. Hereinafter the Defendants will be referred to collectively as the Altheimer Defendants.

### B. The DTS Transaction

Prior to January 31, 1996, the Alpers owned 100% of the stock of Terrific Promotions, Inc. ("TPI"). *Id.* ¶ 11. TPI engaged in two types of business: (1) retail sale of consumer goods priced at one dollar through their "Dollar Bill$" retail outlets supplied by a distribution center; and (2) wholesale merchandising of brand-name products to distributors and wholesalers. *Id.* ¶ 10. In the fall of 1995, Dollar Tree Stores, Inc. ("DTS"), a competitor of TPI, offered to purchase the Alpers' retail business and distribu-

---

1. The Alpers withdrew Counts IV–VII in oral argument before Judge Ashman.

2. Defendants have also filed a motion to dismiss, a motion to strike Plaintiffs' request for punitive damages, and several other motions. Judge Nolan made recommendations on those motions, but the court does not address them here.

3. Because she was referred both a motion to dismiss and a motion for summary judgment, Judge Nolan derived her factual summary partly from the complaint and partly from the parties' Rule 12 statements. Subsections B and C are based on Plaintiffs' complaint. In deciding Defendants' summary judgment motion, the court has been careful not to presume the truth of any of Plaintiffs' allegations that are unsupported by the record.

tion center. *Id.* ¶ 11. The Alpers agreed to sell their retail business and distribution center. *Id.* ¶ 12.

In September of 1995, the Alpers retained Lieberman and Altheimer to represent them in the transaction with DTS ("DTS transaction"). *Id.* ¶ 13. On September 18, 1995, the Alpers and Lieberman met for the first time and Lieberman [allegedly] promised the Alpers that he would be personally and actively involved in and supervise Altheimer's work on the DTS transaction and that the Alpers would be charged a fair and appropriate fee for legal services. *Id.* ¶ 14. From the outset of the representation, the Alpers [allegedly] advised Lieberman and Altheimer that the DTS transaction would be limited to the sale of TPI's retail business and distribution center. *Id.* ¶ 16. According to the Alpers, TPI's wholesale merchandising business was "off the table." *Id.*

Without the Alpers' approval, Schlossberg and other inexperienced Altheimer attorneys performed the work associated with the DTS transaction, including preparing and reviewing the necessary documents and formal agreements. *Id.* ¶ 19. During the course of the representation, Leiberman [allegedly] assured the Alpers that he was personally involved in and responsible for the work on the DTS transaction. *Id.* ¶¶ 20–23.

On or about January 16, 1996, the Alpers executed signature pages of various transaction documents. *Id.* ¶ 25. . . . According to the Alpers, Altheimer's attorneys did not meet with them to explain and review the terms of the final transaction documents prior to their execution of the signature pages. *Id.* The transaction closed on January 31, 1996. *Id.* ¶ 26.

The Alpers later discovered that Altheimer [allegedly] negligently drafted the transaction documents and "did not protect the Alpers' interests and afforded DTS the opportunity to take the TPI/Alper wholesale merchandising business." *Id.* ¶ 25. The Alpers allege that the Altheimer Defendants knew that the transaction documents might not "inhibit DTS from hiring key wholesale merchandising personnel" or "prohibit DTS from pursing a continuation of the TPI/Alper wholesale merchandising business." *Id.* ¶ 26. The Alpers maintain that "negotiations could have been pursued with DTS so as to immunize and protect the TPI/Alper wholesale merchandising business as well as critical employment relationships with key wholesale merchandising personnel." *Id.*

## C. Events After the DTS Transaction

After the closing, Timothy Avers ("Avers"), "a critical employee" of TPI's wholesale business, announced that he was joining DTS and taking other key TPI wholesale personnel and information with him. *Id.* ¶ 28. On February 12, 1996, the Alpers met with Altheimer attorneys and sought advice regarding Avers' conduct. *Id.* ¶ 29. On this same day, the Alpers paid Altheimer $200,000 for legal services associated with the DTS transaction. *Id.* The Alpers allege that at least as early as February 12, 1996, Altheimer knew or should have known that the Alpers' "interests had been compromised by A & G's incompetence and breaches of duty." *Id.* ¶ 30. However, at the February 12, 1996 meeting, Altheimer suggested potential claims by the Alpers against DTS and failed to mention its own attorneys['] "misfeasance and negligence." *Id.*

Following the February 12, 1996 meeting, the Alpers retained new counsel. *Id.* ¶ 32. On February 20, 1996, the Alpers' new counsel met with Schlossberg to discuss the details of the DTS transaction. *Id.* During that meeting, Schlossberg confirmed that the Alpers did not want to sell their wholesale business and indicated that the transaction documents prepared by Altheimer attorneys did not specifically retain the wholesale business. *Id.* At the sane [sic] meeting, the Altheimer Defendants stated that they would cooperate with the

Alpers in any litigation against DTS and Avers. *Id.*

### D. Litigation[2]

#### 1. State Court Proceedings

On March 13, 1996, the Alpers filed an action against DTS and Avers in the Circuit Court of Cook County, Illinois. 12(N) ¶ 7. Approximately two weeks later, the Alpers filed their first amended verified complaint alleging the following claims against DTS and Avers: (1) fraud and fraudulent inducement; (2) breach of confidential agreement; (3) breach of Avers' employment agreement; (4) negligent misrepresentation; (5) misappropriation of proprietary information in violation of the Illinois Trade Secrets Act; (6) civil conspiracy; (7) unfair competition; (8) specific performance of the confidentiality agreement; (9) specific performance of Avers' employment agreement; (10) invalidity of non-competition agreement; (11) breach of fiduciary duty; (12) breach of the stock purchase agreement; and (13) breach of covenant of good faith and fair dealing. 12(N) ¶ 8. The Alpers made no claims against Altheimer or its attorneys in their state court action. 12(N) ¶ 9.

2. The remaining facts are taken from the Alpers' Rule 12(N)(3)(a) statement and various public records attached to Defendants' 12(M) statement. These facts have not been considered when recommending rulings on Defendants' Motion to Dismiss. In any event, a court may take judicial notice of matters of public record without converting a 12(b)(6) motion into one for summary judgment. *Henson v. CSC Credit Services*, 29 F.3d 280 (7th Cir.1994).

On April 16, 1996, DTS and Avers moved to dismiss the Alpers' first amended verified complaint under 735 ILCS 5/2–615 on the basis that the complaint was insufficient as a matter of law. 12(N) ¶ 11. That same day, the Alpers filed a motion to voluntarily dismiss their state court action pursuant to 735 ILCS 5/2–1009(a).[3] 12(N) ¶ 12. [Cook County Circuit Court] Judge Madden denied the Alpers' motion to

voluntarily dismiss their complaint and ordered that the Alpers respond to DTS and Avers' motion to dismiss. 12(N) ¶ 14. On June 28, 1996, Judge Madden granted in part and denied in part DTS and Avers' motion to dismiss. 12(N) ¶ 15; 12(M), App.H. Judge Madden's order stated that "[w]ith respect to the Counts that are not dismissed, Plaintiffs have sufficiently pled claims upon which relief may be granted." 12(M), App.H. Count IV (negligent misrepresentation), Count XI (breach of fiduciary duty), and Count XIII (breach of covenant of good faith and fair dealing) were dismissed with leave to replead. 12(M), App.H.

3. 725 ILCS 5/2–1009(a) provides: "The plaintiff may, at any time before trial or hearing begins, upon notice to each party who has appeared or each such party's attorney, and upon payment of costs, dismiss his or her action or any part thereof as to any defendant, without prejudice, by order filed in the cause."

Less than a month later, the Alpers filed a second motion under 735 ILCS 5/2–1009(a) to voluntarily dismiss their state court complaint. 12(N) ¶ 17. On July 25, 1996, Judge Madden granted the motion and dismissed the Alpers' action without prejudice. 12(N) ¶ 17; 12(M), App.I. Interestingly, DTS and Avers appealed the order of dismissal. 12(N) ¶ 18. On December 15, 1997, the Illinois Appellate Court dismissed the appeal for lack of jurisdiction. 12(N) ¶ 21.

#### 2. Federal Court Proceedings

On April 16, 1996, the Alpers filed a lawsuit against DTS and Avers in the Northern District of Illinois containing factual allegations substantially the same as the factual allegations contained in their state court complaint. 12(M), App.G; 12(N) ¶ 13. The Alpers' federal complaint contained thirteen counts which were identical to their state court counts and added claims of antitrust violations and securities fraud. 12(M), Apps.C, G, L.

DTS and Avers moved to dismiss the Alpers' federal antitrust and securities claims pursuant to Federal Rule of Civil Procedure 12(b)(6). 12(M), App.L. On November 27, 1996, Judge Lindberg dismissed the Alpers' federal claims with prejudice and failed to exercise supplemental jurisdiction over the Alpers' state law claims. 12(M), App.L; *Terrific Promotions, Inc. v. Dollar Tree Stores*, 947 F.Supp. 1243 (N.D.Ill.1996). The Alpers moved for reconsideration of Judge Lindberg's decision and that motion was denied. 12(M), App.L; 12(N) ¶ 26; *Terrific Promotions, Inc. v. Dollar Tree Stores*, 947 F.Supp. 1243 (N.D.Ill.1996). The Alpers did not appeal either of Judge Lindberg's orders. 12(M), App.M; 12(N) ¶ 27.

(R & R, at 2–8.)

In his ruling, Judge Lindberg made certain findings regarding the sale of TPI. He stated, "As a matter of law this transaction conveyed ownership of the entire corporate entity from the Alpers to DTS." 947 F.Supp. at 1248. He further found that "there is nothing on the face of the Stock Purchase Agreement which provides that DTS was forbidden from hiring Avers or from using [the Alpers'] wholesale business information. As a matter of law, then, the Alpers were not justified in relying on DTS's representations." *Id.* at 1249.

Schlossberg and Lieberman were deposed as part of the proceedings before Judge Lindberg, and both stated that they believed the Alpers' stock purchasing agreement was a stock sale that transferred one hundred percent of the Alpers' stock interests in TPI to DTS. (12N Ex. G, at 59, Ex. H, at 188.) Schlossberg further testified that he did not believe that the transaction documents prohibited DTS from hiring Avers or acquiring the Alpers' wholesale business, and that he had no reason to believe that DTS misled or deceived him. (*Id.* Ex. L, at 67, Ex. I, at 316.)

Count III of Plaintiffs' first amended complaint alleges, *inter alia*, that Defendants were negligent because they failed to:

- take all necessary steps to maximize the benefits of the Dollar Bill$ transaction to the Alpers;
- properly document the terms of the Dollar Bill$ transaction as specified by the Alpers; [and]
- properly prepare the Dollar Bill$ transaction documentation so that the TPI/Alper wholesale merchandising business was specifically immunized from that transaction.

(First Am.Compl. ¶ 59.)

Count VIII alleges, *inter alia*, that Defendants breached their fiduciary duty to Plaintiffs. Plaintiffs claim that upon learning that their conduct and advice was at issue, Defendants should have advised the Alpers that Altheimer's "continued representation of the Alpers would be materially limited by [Defendants'] own interests." (*Id.* at ¶ 85.) Further, Altheimer "had a fiduciary duty not to betray the Alpers by later attempting in bad faith to conceal their own negligence and protect themselves at the Alpers' expense." (*Id.* ¶ 86.) The complaint alleges that Defendants accepted payment of $200,000 for their services, even though they failed to:

- properly prepare the transaction documents so that the Alpers would maintain the wholesale business and continue to employ key wholesale personnel;
- advise the Alpers that the Dollar Bill$ transaction documents would lead to the loss of the wholesale merchandising business;
- advise the Alpers to seek the advice of independent counsel upon the discovery of Defendants' negligence.

(*Id.* ¶ 87.) These actions, according to Plaintiffs, were a breach of fiduciary duty.

## DISCUSSION

The court will grant summary judgment only if it finds no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Thus, if a plaintiff "fails to make a showing sufficient to establish the existence of an ele-

ment essential to [the plaintiff's] case," summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court views the record and all inferences to be drawn from it in the light most favorable to the non-moving party. *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991).

## Count III—Professional Negligence

■ To make out a claim for legal malpractice, a plaintiff must show (1) the existence of an attorney-client relationship that establishes a duty on the part of the attorney; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause; and (4) actual damages. *Lucey v. Law Offices of Pretzel & Stouffer,* 301 Ill.App.3d 349, 353, 234 Ill.Dec. 612, 703 N.E.2d 473, 476 (1st Dist.1998). The latter two related elements often present a stumbling block for plaintiffs. Proximate cause means " 'but for' the attorney's negligence, the client would have successfully defended or prosecuted the underlying suit," *Bartholomew v. Crockett,* 131 Ill. App.3d 456, 465, 86 Ill.Dec. 656, 475 N.E.2d 1035, 1041 (1st Dist.1985), and damages are not presumed but must be pleaded and proved, *Farm Credit Bank v. Gamble,* 197 Ill.App.3d 101, 103, 143 Ill. Dec. 844, 554 N.E.2d 779, 780 (3rd Dist. 1990).

In their motion for summary judgment, Defendants argue that the Alpers' malpractice claim is premature because the Alpers have not resolved their claims against DTS and Avers. Thus, Defendants contend, the Alpers cannot meet their burden of proving proximate cause and actual damages, because they may be able to recover from DTS. If the Alpers prevail on their state law claims against DTS, Defendants maintain, then the Alpers have suffered no damages from any alleged negligence by Altheimer.

As Judge Nolan noted, " 'Illinois courts have frequently recognized, either expressly or implicitly, a cause of action for legal malpractice will rarely accrue prior to the entry of an adverse judgment, settlement, or dismissal of the underlying action in which plaintiff has become entangled due to the purportedly negligent advice of his attorney.' " (R & R, at 25 (quoting *Lucey,* 301 Ill.App.3d at 356, 234 Ill.Dec. 612, 703 N.E.2d at 479)). Judge Nolan surveyed several Illinois cases,[4] including *Bartholomew, Lucey, Farm Credit Bank,* and *Schulte v. Burch,* 151 Ill.App.3d 332, 104 Ill.Dec. 359, 502 N.E.2d 856 (4th Dist. 1986), and remarked that this authority "strongly suggest[ed] that the Alpers' legal malpractice claim is premature and they should pursue a determination on the merits of their claims against DTS and Avers prior to bringing their malpractice claim against the Altheimer Defendants." (R & R, at 28.) Judge Nolan concluded, however, that Section 13–217 of the Illinois Code of Civil Procedure precluded the Alpers from re-filing their state law claims against DTS and Avers, because this provision limits litigants to one re-filing after taking voluntary dismissal.[5] In Judge No-

---

4. A district court sitting in diversity must apply the substantive law of the state in which it sits. *Doe v. Roe No. 1,* 52 F.3d 151, 154 (7th Cir.1995). Therefore, this court will apply Illinois law.

5. Section 13–217 provides:

In the actions specified in Article XIII of this Act or any other act or contract where the time for commencing an action is limited, if judgment is entered for the plaintiff but reversed on appeal, or if there is a verdict in favor of the plaintiff and, upon a motion in arrest of judgment, the judgment is entered against the plaintiff, or the action is dismissed by a United States District Court for lack of jurisdiction, or the action is dismissed by a United States District Court for improper venue, then, whether or not the time limitation for bringing such action expires during the pendency of such action, the plaintiff, his or her heirs, executors or administrators may commence a new action within one year or within the remaining period of limitation, whichever is greater, after such judgment is reversed or entered against the plaintiff, or the action is dismissed by a United States District Court for lack of jurisdiction, or the action is dismissed by a United States District Court for improper venue.

735 ILCS 5/13–217.

lan's view, because Section 13–217 barred the Alpers from pursuing their claims against DTS and Avers, they should be allowed to proceed with their malpractice suit against Altheimer, on the grounds that a plaintiff need not pursue an underlying action where it would be futile to do so. (*See* R & R, at 32–33 (citing *Roberts v. Heilgeist*, 124 Ill.App.3d 1082, 1086, 80 Ill. Dec. 546, 465 N.E.2d 658, 661 (2d Dist. 1984).)) While the court agrees with Judge Nolan's ultimate recommendation that summary judgment be denied, it respectfully disagrees with some of her conclusions in support of that recommendation.

The paradigmatic legal malpractice suit involves a "case within a case": the plaintiff retains the defendant attorney to represent him in litigation, the plaintiff is dissatisfied with the litigation results, and the plaintiff alleges negligence on the part of the attorney. Thus, at the heart of most malpractice actions is an underlying lawsuit, and the issues of duty, breach, causation and damages are all a function of the attorney's performance in that underlying proceeding. Consistent with this scenario, the Illinois courts have developed the prematurity doctrine: "because of the damages element of the action . . . no malpractice exists unless counsel's negligence has resulted in the loss of an underlying cause of action." *Claire Assocs. by Livaditis v. Pontikes*, 151 Ill.App.3d 116, 122, 104 Ill.Dec. 526, 502 N.E.2d 1186, 1190 (1st Dist.1986). The cases cited by Judge Nolan all recite variations of this rule.

For instance, in *Bartholomew*, the plaintiff hired attorneys to represent her after she was injured in a car accident with a vehicle owned by the University of Illinois and driven by a university employee, Mr. Crockett. 131 Ill.App.3d at 458, 86 Ill.Dec. 656, 475 N.E.2d at 1037. Plaintiff attempted to sue the University of Illinois, but her attorneys mistakenly named the

State of Illinois, rather than the Board of Trustees for the University of Illinois, and filed notice of the claim eight days after the statute of limitations had run.[6] *Id.* The plaintiff then sued Crockett for negligence based on the accident and sued her own attorneys for malpractice. *Id.* at 459, 86 Ill.Dec. 656, 475 N.E.2d at 1037. The court held that the plaintiff's claim against her former attorneys was premature because she still had a valid claim against Crockett. *Id.* at 465, 86 Ill.Dec. 656, 475 N.E.2d at 1041. Although the attorneys' conduct allegedly foreclosed her claim against the Board of Trustees, the court found that the plaintiff could not show actual damages until or unless "she fail[ed] to recover or fail[ed] to fully recover" compensation for her accident-related injuries. *Id.*

*Lucey* considered a situation in which the attorney's advice resulted in a lawsuit by a third party against the attorney's client; the client then sued for malpractice. Plaintiff Lucey, an employee of the brokerage firm the Chicago Corporation, started his own competing brokerage firm. 301 Ill.App.3d at 351, 234 Ill.Dec. 612, 703 N.E.2d at 475. The plaintiff obtained and followed legal advice from the law firm of Pretzel & Stouffer regarding the propriety of continuing his relationship with one of the Chicago Corporation's main clients. *Id.* After the client transferred its account to the plaintiff's new firm, the Chicago Corporation sued the plaintiff for loss of the account. The plaintiff in turn sued Pretzel & Stouffer for negligent advice. *Id.* at 352, 234 Ill.Dec. 612, 703 N.E.2d at 476. Because damages were only a "mere potentiality prior to resolution of the Chicago Corp. litigation," the *Lucey* court held that the plaintiff's malpractice claim was premature. *Id.* at 359, 234 Ill.Dec. 612, 703 N.E.2d at 480–81. The court observed that where a party is uncertain

---

[6]. The plaintiff was able to "file a complaint in the Court of Claims for property damages only, identifying Crockett as an agent of the State," as well as "a worker's compensation claim against the State of Illinois," for whom

the plaintiff worked. She settled her property damage claim, and executed a release on the other claim. 131 Ill.App.3d at 458–59, 86 Ill. Dec. 656, 475 N.E.2d at 1037.

whether an attorney's conduct will cause injury, "damages are speculative, and no cause of action for malpractice can be said to exist." *Id.* at 355, 234 Ill.Dec. 612, 703 N.E.2d at 478 (cite omitted).

In *Schulte v. Burch,* the plaintiffs, owners of a contractor supply company, provided construction materials to a subcontractor and apparently did not receive payment. The attorney retained by plaintiffs allegedly failed to file suit to enforce a mechanics' lien within the statutorily-prescribed time limit, and the plaintiffs sued for malpractice. Reasoning from *Bartholomew,* the court held that the plaintiffs' claim was premature because they still had valid causes of action against the subcontractor's general contractor, as well as the surety on the contractor's bond. Therefore, the court concluded that the plaintiffs could not proceed against their attorney until it was clear that they were unable to recover. 151 Ill.App.3d at 335–36, 104 Ill.Dec. 359, 502 N.E.2d at 859.

Finally, Judge Nolan considered *Farm Credit Bank,* in which the defendant Bruce Gamble allegedly failed to make payments on a loan, the bank filed foreclosure actions, and Gamble filed a third party complaint claiming fraud and legal malpractice by an attorney, Mr. Everett. *Farm Credit Bank* did not explain Gamble's theory of how Everett erred, but simply held that the plaintiff could not show damages because the foreclosure proceedings were still pending. 197 Ill.App.3d at 104, 143 Ill.Dec. 844, 554 N.E.2d at 781.

These cases all required the plaintiff to resolve underlying litigation before proceeding against his or her lawyer, but always in a context in which the plaintiff's damages were not yet ascertainable. Indeed, in *Bartholomew* and *Schulte,* the proceedings for which the defendant attorneys were originally retained were not yet complete. The circumstances here are fundamentally different, however, in two respects: first, the underlying transaction—the sale of TPI—in which Altheimer represented the Alpers is complete; and

second, the damages the Alpers claim to have incurred as a result of Defendants' conduct are not speculative, because the Alpers no longer own the TPI wholesale operation. This distinction is crucial, because the cases discussed above, as well as others, ground their finding of prematurity in a determination that damages are too speculative. *See Lucey,* 301 Ill.App.3d at 355, 234 Ill.Dec. 612, 703 N.E.2d at 478 ("When uncertainty exists as to the very fact of damages, as opposed to the amount of damages, damages are speculative."); *Farm Credit Bank,* 197 Ill.App.3d at 104, 143 Ill.Dec. 844, 554 N.E.2d at 781 ("[The plaintiff] at this point cannot demonstrate that he was injured by [the attorney's] advice."); *Schulte,* 151 Ill.App.3d at 335–36, 502 N.E.2d at 859; *Bartholomew,* 131 Ill.App.3d at 458, 86 Ill.Dec. 656, 475 N.E.2d at 1037.

In oral argument before Judge Ashman, Defendants' counsel essentially conceded that this case does not conform to the typical case-within-a-case model of malpractice litigation. (*See* June 6, 1998 Tr., at 15–20, 53–55.) He further admitted that the transaction for which the Alpers retained Altheimer was complete. (*Id.* at 16–17.) When Judge Ashman asked why this case should be considered premature when no uncertainty remained as to damages, Defendants argued that the prematurity doctrine requires the Alpers to first sue DTS and Avers, because if the Alpers were made whole in that suit, they would not be entitled to recover from Altheimer. (*Id.* at 18–19, 55; *see also* Def. March 18, 1998 Memo, at 20 ("If the Alpers ultimately prevail against DTS and are made whole for their alleged injuries, it will turn out that the Alpers suffered *no injury at all* arising from Altheimer's conduct.") (emphasis in original).) In the court's view, this contention conflates the existence of damages, *i.e.* whether the Alpers have suffered injury, with the issue of causation, *i.e.* whether DTS and Avers, or Altheimer, or both, caused the injury and must make Plaintiffs whole. Defendants do not genuinely dispute the Alpers' assertion that

they have lost the wholesale portion of their merchandising business. Instead, they challenge Plaintiffs' claim that the lawyers are responsible for the loss.

Thus, Defendants' argument must be understood as follows: if, as here, the plaintiff has advanced alternative theories of causation (fraud by DTS and Avers as well as negligence by Altheimer), the plaintiff must first attempt to recover from other potentially liable parties before pursuing a negligence action against their attorneys. Defendants' chief authority for this proposition is *Svedala Indus. v. Winston & Strawn*, No. 92 C 0010, 1993 WL 198918 (N.D.Ill. June 10, 1993), and *City of Plaquemine v. Brand*, 755 F.Supp. 698 (M.D.La.1990).

Neither of these district court cases is binding authority, and both are distinguishable. *Plaquemine* involved an electrical power contract between the City of Plaquemine and a power company. A billing dispute arose between the city and the power company, and the city sued the power company for breach of contract. At the same time, the city sued its former attorney, who had negotiated and drafted the contract; the attorney removed to federal court on diversity grounds. The *Plaquemine* court did not explain the nature of the contract dispute, but did note that the alleged error by the attorney was only one possible basis for the power company to avoid its obligations. Thus, the court could not say that the attorney's alleged malpractice was directly linked to the contract dispute, and therefore could not say that the city had suffered any damages from malpractice. 755 F.Supp. at 700. The court implied that unless the power company successfully defended based on the attorney's error, the city could not prove any damages arising from the alleged malpractice. *Id.* ("[T]here is not sufficient damage to commence the running of prescription [—the statute of limitations—] in the legal malpractice action at this time.").

In this case, by contrast, there is no question about the effect of the contract: the TPI wholesale business has been transferred. *See* 947 F.Supp. at 1248 ("As a matter of law, this transaction conveyed ownership of the entire corporate entity from the Alpers to DTS."). The Alpers' damages do not depend on the outcome of some other litigation; the suit against DTS and Avers would affect who, if anyone, the Alpers recover from, not whether they are injured.

This distinction applies to *Svedala* as well. In that case, the defendant attorneys negotiated the sale of four lapsed patents on behalf of their client pursuant to a "patent reinstatement agreement," under which the attorneys would reinstate the patents before the sale. 1993 WL 198918, at *1. The attorneys allegedly failed to restore one of the four patents contemplated in the agreement, and the purchaser withheld the $200,000 it would have paid for the patent. The client sued the attorneys for negligence in failing to restore the patent; the defendants, however, presented evidence that the patent was in fact restored in a timely fashion. Judge Marovich found that, in light of the defendant's evidence, it was not clear that the purchaser properly withheld payment. The defendants argued, and the court agreed, that the plaintiff would sustain damage only if it was determined that the purchaser was not obligated to make payment. *Id.* at *3 ("Without a determination that [the purchaser] does not owe [the plaintiff] the sum, [the plaintiff] has not yet suffered a loss."). The court concluded that damages were still speculative, and granted summary judgment for the defendants. *Id.* at * 4.

The holding of *Svedala* does not advance Altheimer's position here. If Judge Marovich had forced the plaintiff to sue the purchaser first, under an alternative theory of recovery, even though there was no dispute that the attorneys had not restored the patent, *Svedala* would be more instructive. By the same token, if it were unclear in this case whether the document drafted by Altheimer actually transferred

the TPI wholesale operation to DTS or not, Altheimer might point to *Svedala* as a helpful analog. As it is, however, *Svedala* is another case to support the rule, not really disputed by either party here, that where damages are speculative, a malpractice action is premature.

■ In sum, Defendants have not produced, and the court has not uncovered, a case in which 1) the underlying transaction or proceeding for which the attorneys were retained is complete, 2) the plaintiff has adduced evidence of a breach of duty and damages, 3) the plaintiff has at some point advanced more than one theory of causation, and 4) the court has held that the plaintiff cannot recover from the attorneys for negligence until they have exhausted other potentially viable causes of action to recover their loss. The court does not perceive a sound policy rationale for forcing a plaintiff to sue all other potentially responsible defendants before suing their attorneys; indeed, in oral argument Defendants' counsel allowed that such a hard-and-fast rule would be "nutty." [7] (June 6, 1998 Tr., at 54.)

Moreover, some Illinois courts have indicated that if damages are not speculative— *i.e.* if the primary rationale for the prematurity doctrine is absent-then plaintiffs should be permitted to proceed. *Bennett v. Gordon*, 282 Ill.App.3d 378, 217 Ill.Dec. 924, 668 N.E.2d 109 (1st Dist.1996), is the best example. In *Bennett*, the plaintiff brought a malpractice suit against the attorney who represented her in a divorce proceeding, alleging that the settlement agreement negotiated by the attorney was disadvantageous to her. The attorney objected that the claim was premature, because plaintiff had "viable causes of action

against her ex-husband for all the relief she s[ought]," and therefore damages were indeterminate. *Id.* at 382, 217 Ill.Dec. 924, 668 N.E.2d at 112. The court held the plaintiff's negligence claim was "not premature simply because the amount of her damages are not ascertainable from the complaint," and "the fact that the divorce court can enforce the settlement agreement against [the ex-husband] does not relieve the defendants from their alleged breach stemming from their inadequate representation." *Id.; see also Glass v. Pitler*, 276 Ill.App.3d 344, 351, 212 Ill.Dec. 730, 657 N.E.2d 1075, 1080 (1st Dist.1995) ("[I]f damages resulting from the legal malpractice action can be otherwise factually established, a judicial determination in the underlying action is not required."). Similarly, Altheimer should not be allowed to deflect a negligence suit simply because recovery for the alleged damages might be available elsewhere.

Two additional factors buttress the court's conclusion that the Alpers should not be required to exhaust potential remedies against DTS and Avers before they can sue Altheimer. First, at this point, the Alpers' claims against DTS and Avers are arguably vulnerable.[8] There is at least a reasonable possibility that, as Judge Nolan found, the Alpers may not re-file their claims in state court because of Section 13–217. *See Timberlake v. Illini Hosp.*, 175 Ill.2d 159, 162–63, 221 Ill.Dec. 831, 676 N.E.2d 634, 636 (1997) (holding that Section 13–217 barred re-filing by plaintiff who had already voluntarily dismissed action in state court and had action dismissed for lack of pendent jurisdiction in federal court).[9] Further, comments by

---

7. Of course, counsel went on to argue that Defendants' position does not embrace such a rule, but the court does not agree.

8. The court need not resolve the parties' vigorous debate as to whether these factors mean that any attempt to re-file claims against DTS and Avers would be utterly futile, since the Alpers are not bound to sue DTS and Avers first.

9. The court recognizes that it is not certain whether a second suit filed while the first suit is still pending constitutes re-filing within the meaning of Section 13–217. The Illinois Supreme Court has stated simply that a "re-filed action is an entirely new and separate action, not a reinstatement of the old action." *Dubina v. Mesirow Realty Dev., Inc.*, 178 Ill.2d 496, 504, 227 Ill.Dec. 389, 687 N.E.2d 871, 875 (1997). In light of *Timberlake*, however, the Alpers will have an uphill battle at best.

Judge Lindberg—"the Alpers were not justified in relying on DTS's representations"—and Schlossberg's and Lieberman's own testimony have undercut the Alpers' arguments that DTS is liable for fraud, etc. Plaintiffs have apparently abandoned their claims in light of these considerations, and the court is not inclined to force them to litigate a crippled cause of action.[10]

Second, because Plaintiffs are aware of their alleged injury—the loss of the wholesale operation—their cause of action against Altheimer has accrued and the statute of limitations has begun to run. *See Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 536 F.2d 730, 734 & n. 3 (7th Cir.1976); *Hinkle v. Ross*, No. 94 C 5889, 1995 WL 723783, at *4 (N.D.Ill. Dec.4, 1995) (surveying Illinois law, reciting rule that a cause of action accrues upon a plaintiff's discovery that an injury occurred and that the injury was wrongfully caused) (quotes omitted); *Dancor Int'l Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill.App.3d 666, 674, 224 Ill.Dec. 302, 681 N.E.2d 617, 622 (1st Dist.1997) (discovery rule is operative and statute of limitations begins to run when plaintiff has enough information to be on notice of injury and that injury may have been wrongfully caused). The court certainly would be reluctant to hold that, even though they have a cognizable cause of action and the statute of limitations clock is running, Plaintiffs cannot actually bring their suit because they must first try to recover for their injury from possible tort-feasors other than their attorneys. Indeed, Defendants have offered to stipulate to a tolling

10. The court wonders whether, if the Alpers had never chosen to try to sue DTS and Avers, Altheimer would still insist that they do so before filing their malpractice claim. Judge Ashman raised this hypothetical in oral argument, and Defendants do not appear to have a principled basis for distinguishing that situation from the one in the case at bar.

11. If the court were to enter summary judgment, Altheimer offers to stipulate as follows: Defendants Altheimer & Gray, Myron Lieberman and Robert L. Schlossberg agree that they will not assert any statute of limi-

of the statute of limitations,[11] an apparent proposal to insure the Alpers against the lapse of their right to proceed here during the pendency of any litigation they might attempt against DTS and Avers.

For all the reasons discussed above, the court is not persuaded that the Alpers must first seek relief from DTS and Avers. Of course, nothing prevents Defendants from offering evidence that it was misconduct by DTS or Avers that caused Plaintiffs' damages. Further, if the Alpers act contrary to every representation they have made in response to Defendants' motion for summary judgment and sue DTS and Avers while this action is pending, a stay or some other measure might well be appropriate. Unless that unlikely scenario develops, however, the court concludes that Plaintiffs may proceed against Altheimer now. Defendants' motion for summary judgment on Count III is denied.

### Count VIII—Breach of Fiduciary Duty

Defendants have also argued that because the same factual allegations undergird Counts III and VIII, the prematurity doctrine applied with equal force to Count VIII, and therefore summary judgment on the Alpers' claim for breach of fiduciary duty is appropriate. Having rejected Defendants' prematurity arguments, the court denies Defendants' request for summary judgment on that basis for Count VIII. The court will take up the other potential vulnerabilities of Count VIII as part of Defendants' motion to dismiss.

tations or statute of repose as a defense to any claim that was asserted in the action *Alper v. Altheimer & Gray*, No. 97 C 1200 (N.D.Ill.), provided that plaintiffs Pamela J. Alper and Michael N. Alper assert any such claims within sixty days of obtaining a final judicial determination on the merits of all of the claims which had been asserted by the Alpers against Dollar Tree Stores, Inc. and Timothy Avers in the action *Terrific Promotions, Inc. v. Dollar Tree Stores, Inc.*, No. 96 CH 2491 (Cir.Ct.Cook Cty., Ill.). (March 18, 1998 Memo, at 32 n. 3.)

## CONCLUSION

The Alpers' claim against Defendants is not premature as a matter of law. Defendants' motion for summary judgment as to Counts III and VIII is denied.